UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY A. GAZVODA,

        Plaintiff,                                Case No. 15-cv-14099

v.                                                   Honorable Thomas L. Ludington

SECRETARY OF HOMELAND SECURITY, and
COMMISSIONER OF UNITED STATES
CUSTOMS AND BORDER PROTECTION,

        Defendants.

_____/

**OPINION AND ORDER DISSOLVING PRELIMINARY INJUNCTION AND DENYING MOTION FOR PRELIMINARY INJUNCTION**

    Plaintiff Anthony A. Gazvoda filed a verified complaint against Defendants Jeh Johnson, Secretary of the Department of Homeland Security, and R. Gil Kerlikowske, Commissioner of U.S. Customs and Border Protection, on November 22, 2015. *See* Pl.'s Compl., ECF No. 1. He has sued both the Secretary and the Commissioner in their official capacities. He alleges that the Defendants have not accommodated his disability in accordance with the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794(a).

    Gazvoda's motion for a temporary restraining order was denied on November 24, 2015. Op. & Order, ECF No. 5. A hearing on Gazvoda's request for a preliminary injunction was held on January 26, 2016. By the time of the hearing, both sides had extensively briefed Gazvoda's motion.

    On January 29, 2016, Defendants filed a motion to dismiss Gazvoda's complaint, arguing, as they did in their response briefs to Gazvoda's motion for a preliminary injunction, that Gazvoda did not exhaust his administrative remedies and that the relief Gazvoda seeks is

contrary to the policy of the Department of Customs and Border Protection. Defendants' motion was denied on April 7, 2016 and a preliminary injunction was conditionally imposed. The parties were directed to conduct limited discovery into the availability of positions during the relevant time period in which Gazvoda's request for a transfer was pending. The parties were also directed to submit supplemental briefs on the topic.

I.

The facts as set forth in the Court's April 7, 2016 Opinion will be repeated herein and elaborated to include the information obtained during the parties' limited discovery period.

Plaintiff Anthony Gazvoda is a veteran of the Afghanistan War and is currently on medical leave from his job as a United States Customs and Border Patrol Officer. Defendants are the lead Government officials in charge of the Department of Homeland Security ("DHS") and the United States Customs and Border Protection Agency ("CBP"). The CBP is a subdivision of DHS and is "charged with securing the borders of the United States." Pl.'s Compl. ¶ 10, ECF No. 1.

A.

Gazvoda was deployed to Afghanistan in January 2009. He served in combat from January to November 2009. While in combat Gazvoda was engaged in numerous firefights and was tasked, along with his team, with clearing improvised explosive devices. During his time in combat, Gazvoda witnessed a number of gruesome and unsettling injuries to individuals with whom he served closely.

Upon return from combat, Gazvoda immediately experienced difficulty sleeping. He sought help and, by May 2010, was free of his sleep issues. "Gazvoda began employment with Defendant CBP on or about September 11, 2010." Id. at ¶ 15. Gazvoda trained for approximately

five months in New Mexico at the conclusion of which, in February 2011, he was stationed at a CBP post in Laredo, Texas.

**B.**

After two months of being stationed in Laredo, Gazvoda "began experiencing insomnia, anxiety, depression, and panic attacks." *Id*. at ¶ 17. He sought help and benefits from the Veterans Affairs ("VA") in Laredo, but to no avail. Gazvoda reports that his symptoms gradually increased and he alleges that this forced him to leave Laredo and take unpaid administrative leave.

He sought assistance at the VA hospital in Grayling, Michigan. Gazvoda took leave without pay (LWOP) beginning in December of 2011. Eventually, CBP classified him as Absent Without Leave (AWOL). Gazvoda contested this classification since his leave was due to ongoing mental health issues. CBP then retroactively transitioned Gazvoda to paid administrative leave status. He has been on paid administrative leave status (retroactively for a period) since leaving Laredo.

**C.**

Upon traveling to Michigan and seeking help at the Grayling VA hospital, Gazvoda consulted with a number of mental health professionals. Eventually, he was diagnosed with posttraumatic stress disorder ("PTSD"). The medical professionals that examined Gazvoda concluded that the environment of Laredo was too similar to the environment of Afghanistan, the trigger-point for Gazvoda's PTSD. Specifically, the presence of dark-skinned individuals that spoke a foreign language aroused painful and unpleasant memories from when Gazvoda was deployed. The doctors also recommended against placing Gazvoda in a densely populated city. None of the doctors opined on any dissimilarities between individuals of Hispanic or Latino

ethnicity and individuals of Arab, Middle-Eastern, or South Asian ethnicity. Nor did the doctors opine on Gazvoda's apparent ability to understand the Spanish language and whether he could understand any of the indigenous languages spoken in Afghanistan along the Pakistan border, where he was deployed. Nevertheless, all of the doctors Gazvoda sought out concluded that he should not, at a minimum, be stationed in Laredo if he is to see any improvement in his condition and be able to function as a Border Patrol Officer. All of the doctors supported a "compassionate transfer" to a northern environment.

Gazvoda initially received his diagnosis of PTSD in 2012, but one of his examiners noted that his condition was chronic and severe and likely to persist into the foreseeable future. *See* Report of John Haskin, Pl.'s Compl., Ex. D, ECF No. 1-5. Accordingly, Gazvoda has been evaluated as recently as May 19, 2015[1] by a Board Certified Psychiatrist that does not recommend that he return to Laredo:

> I continue to support the paragragh below:
>
> "The patient had experiences outside the realm of usual human experiences and developed classic symptoms of PTSD including hyper-autonomic symptoms, fear, hypervigilance, exaggerated startle, reliving previous experiences, dreams and nightmares, difficulty controlling her feelings with tense and anxiety, losing interest in previously enjoyed activities with reduction in sleep and subsequent difficulties with attention and concentration. In my opinion clear relationship between job location placement, with unfamiliar and densely populated area, and exacerbation of his symptoms and continued deleterious affect, anticipation anxiety continues regarding uncertainty of future. I would support that it would not be in his best interest to return to that particular assignment. He will continue with his VA treatment. He has had reviewed the VA crisis access mechanism including the handout with inpatient psychiatric resources, local phone numbers. We have also reviewed the medication list is accurate and he will continue treatment with his current VA provider. I not only support the diagnosis of PTSD, but also support hardship transfer back to northern area where there are less environmental triggers, more familarity."

---

[1] There is also a letter presented by Plaintiff that bears a facsimile timestamp from May 26, 2015. But since the letter itself is undated, it is not possible to conclude whether the opinions predate or postdate the opinions in the letter dated May 19, 2015.

*See* May 19, 2015 Swabash Letter, Pl.'s Compl., Ex. B, ECF No. 1-3 (sic throughout). The conclusions and opinions of the medical professionals that evaluated Gazvoda were communicated to Defendants in support of his request for a transfer to a northern border station. Gazvoda specifically requested that he be transferred to a station in Sault Ste. Marie, Michigan. The only reason for this request that Gazvoda provides is that it is near his treating mental health care providers in Grayling. But Gazvoda does not offer any explanation for why he sought out doctors in Grayling, Michigan, in the first instance.

## D.

On January 9, 2015, Gazvoda requested reinstatement. He did not desire to be returned to Laredo so he asked that he either be placed back on LWOP status (this was prior to his leave being reclassified from AWOL to LWOP) or that he be "placed on a Temporary Duty Location Assignment in Sault Ste [sic] Marie, MI." Jan. 9 Reinstatement Req., ECF No. 17-6.

On January 21, 2015, the Agency denied Gazvoda's request to be placed on LWOP status or to be given temporary duty in Sault Ste. Marie. It did retroactively reclassify his AWOL status as LWOP status but informed Gazvoda that going forward he would be placed on administrative leave pending the completion of a fitness for duty examination. This was despite Gazvoda having communicated the opinions of his evaluating doctors to Defendants. CBP directed Gazvoda to attend an Independent Medical Evaluation ("IME"). Gazvoda believes that the psychiatrist who conducted the IME has little or no experience with PTSD or working with veterans. As a result, Gazvoda felt uncomfortable throughout the evaluation.[2]

---

[2] Gazvoda has attempted to obtain the report of the IME, but has been unable to do so. He does not explain the steps he has taken to obtain the report, however, merely that CBP has been uncooperative.

On March 27, 2015, Gazvoda received a letter advising him that he had three options available to him since he had exhausted his leave.[3] These options were repeated in a letter sent to Gazvoda on April 17, 2015. Gazvoda had the option of (1) returning to work; (2) requesting a reasonable accommodation; or (3) resigning from his position. April 17, 2015 Letter, ECF No. 17-8. The letter advised:

> If you choose option two (2) and intend to request a reasonable accommodation, please contact the Privacy and Diversity (PDO) Servicing Officer for the Laredo Border Patrol Sector:
>
> Alicia Davila
> PDO Officer
> 5219 McPherson, Suite 400
> Laredo, Texas 78041
>
> . . .
>
> Please be advised that you may be obligated to provide an interactive evaluation and accommodation recommendation from your treating health care provider and/or provide a description of the accommodation requested, if known, and the explanation of how it would enable you to perform your job.

*Id*. Gazvoda replied on April 21, 2015 that he wished to request a reasonable accommodation.

During this process, on April 1, 2015, Gazvoda requested a second compassionate transfer. He repeated the issues that he has been having with his mental health and again requested that he be transferred to Sault Ste. Marie. He noted that he is "supposed to offer three locations for duty relocation but [he] now know[s his] condition does not warrant this." April 1, 2015 Transfer Req., ECF No. 26-4.

Gazvoda's second request for a compassionate transfer was denied on July 14, 2015 but, due to what Defendants claim was a clerical error, was not communicated to him in writing until January 7, 2016.

---

[3] The March 27, 2015 letter is not in the record but is referenced in an April 17, 2015 letter, which is.

Gazvoda's request for a reasonable accommodation was denied on January 5, 2016. The letter denying that request stated that "you may also contest this action through one of the avenues outlined below. Your election will be considered final on the date any grievance or formal EEO complaint is filed." Accommodation Denial Letter, ECF No. 26-6. The letter gave Gazvoda two options for contesting the denial. He could file a grievance under the Collective Bargaining Agreement or he could file a claim under the Equal Employment Opportunity process. With respect to the latter, the letter provided:

> 2). If you believe you have been discriminated against, you have the right to file an EEO complaint within forty-five (45) calendar days of the receipt of this letter. Filing a reconsideration request or a grievance, as noted above, does not extend the time limits for initiating a complaint of discrimination and does not satisfy the requirements for filing a claim under the EEO complaint process. EEO counseling may be requested by contacting the Privacy and Diversity Office EEO Complaint Intake Hotline . . . , by submitting a Request for EEO Counseling at www.cbp.gov/eeo, or by contacting your servicing DCR Officer Alicia Davila . . .

*Id*.

Gazvoda never filed a grievance under the Collective Bargaining Agreement or an EEO complaint because he initiated the present action in November of 2015.

**E.**

On November 16, 2015, Gazvoda received a letter from CBP informing him that he has been deemed fit for duty following his IME. *See* November 16, 2015 CBP Letter, Ex. F, ECF No. 1-7. Furthermore, the IME concluded that Gazvoda was not disabled and was capable of working at the Laredo border station without accommodation. Gazvoda was directed

> . . . to report directly to Jerry Doyal, Deputy Patrol Agent in Charge of the Laredo North Station on Monday, November 23, 2015 at 8:00 a.m. at the Laredo North Station in Laredo, Texas, where you will transition into the full range and scope of a Border Patrol Agent over a period not expected to last more than four weeks.

*Id*. Gazvoda was further cautioned that "failure to report to the Laredo North Station as directed above may result in your placement on Absent Without Leave (AWOL). Please be advised that

being AWOL and/or your failure to report to duty may result in disciplinary action up to and including removal from Federal employment." *Id*. The letter made no mention of his pending request for a reasonable accommodation or his request for a compassionate transfer.

After receiving this notice, Gazvoda's PTSD symptoms began anew, despite having "largely been under control as a result of medication and treatment." Pl.'s Compl. ¶ 28, ECF No. 1. His symptoms became increasingly severe to the point that he "sought emergency treatment at Mid-Michigan Medical Center" in Midland, Michigan on November 20, 2015. Id. at ¶ 29-30. The physician that treated Gazvoda signed a work release form ordering that Gazvoda could not "travel or undergo strenuous activity until [he was] cleared by a physician." *See* Work Release Form, Ex. G, ECF No. 1-8. Gazvoda provided this form to CBP and was informed that it was insufficient. CBP told him that he would still need to report to Laredo by 8:00 a.m. on November 23, 2015 or he would be listed as AWOL. Pl.'s Compl. ¶ 32, ECF No. 1. Gazvoda alleges that "[t]his situation has caused Plaintiff severe emotional distress, anxiety, and chest pain, and he is not mentally, emotionally, or physically capable of relocating to Laredo, TX by Monday November 23, 2015." *Id*. at ¶ 33. Gazvoda does not represent that he did indeed report to Laredo on Monday November 23, 2015. He filed his request for a temporary restraining order at 7:30 p.m. on Sunday November 22, 2015.

### F.

The Court's April 7 Opinion identified the relevant time period during which Gazvoda's transfer request was pending to be April 21, 2015 to January 5, 2016. Gazvoda was permitted to inquire into any available border patrol positions in the Sault Ste. Marie and Port Huron stations during that time and reasonably after. Gazvoda was permitted to do so because if no positions

were available, Gazvoda's claim for an accommodation could not succeed as a matter of law. Gazvoda's discovery revealed a number of open positions. According to Gazvoda:

> . . . during the period which the request remained pending before the Government, two BPAs left the stations at issue, one voluntarily and one via a transfer. It was also revealed that five BPAs transferred to Sault Ste. Marie and two BPAs transferred to Port Huron during the time period at issue.

Pl.'s Supp. Br. 7, ECF No. 35.

Defendants explain that transfers of border patrol agents are governed by two collectively bargained agreements between CBP and the border patrol agents' union. One agreement governs relocations funded by CBP and was implemented in 2010. The other agreement governs voluntary relocations that are funded by the agent seeking transfer and was implemented in 2014. Both agreements give preference to more senior agents when determining eligibility for transfer. According to Defendants, all of the available positions identified by Gazvoda were filled by more senior agents. Thus, he could not qualify for transfer and no positions were open to him.

## II.

Four factors govern whether the Court will issue a preliminary injunction: (1) whether the plaintiff has demonstrated a substantial likelihood of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would harm others; and (4) whether the public interest is served by granting injunctive relief. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citation omitted); *see also Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).

## III.

The Court's April 7 Opinion conditionally granting Gazvoda's motion for a preliminary injunction identified two preliminary injunction factors that warranted further consideration following discovery: Gazvoda's likelihood of success on the merits and if he would suffer irreparable harm without injunctive relief.

**A.**

Through discovery Gazvoda has identified a number of openings in both the Sault Ste. Marie border patrol station and the Port Huron border patrol station. Defendants do not contest these openings. Rather, Defendants argue that the openings could not have been used to accommodate Gazvoda because of the seniority provisions of the two agreements between Customs and Border Protection and border patrol officers, including Gazvoda. The relevant section of the 2010 agreement is:

> 5.1.b. Selection Certificates by Seniority. CBP will generate a list composed of all agents, referred in order of seniority and without regard to grade, who have requested relocation for each duty station. Certificates will be color coded with an agent's first and second preferred locations, so selecting officials can easily identify an agent's preferred location(s).
>
> For the purposes of this program, seniority consists of the total Border Patrol Agent (occupational series GS-1896) service time.

2010 Vol'y Relocation Prog. Memo., Ex. 1, Att. A, ECF No. 36-1. A similar provision in the 2014 memorandum reads:

> c.  In the event the Agency is not able to approve all voluntary reassignment requests, it will make approval determinations using the following criteria:
>
>    i.  Duty locations that are over staffed.
>
>    ii.  Qualifications as outlined in resume: Identifying critically needed skillsets.
>
>    iii.  *Seniority as defined in the attached seniority definition.*
>
> . . .

2014 Vol'y Relocation Memo. § D.2.c.iii., Ex. 1, Att. C., ECF No. 36-1 (emphasis added). Defendants contend that these provisions, and the agreement as a whole, barred CBP from offering any of those positions to Gazvoda because he did not possess the requisite seniority to obtain a transfer.

Defendants cite to *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 403-04 (2002), in support of the proposition that an accommodation that violates a collectively bargained seniority system is unreasonable. The Supreme Court in *U.S. Airways* articulated the policy reasons that support this strong rule:

> For one thing, the typical seniority system provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment. These benefits include "job security and an opportunity for steady and predictable advancement based on objective standards." They include "an element of due process," limiting "unfairness in personnel decisions." And they consequently encourage employees to invest in the employing company, accepting "less than their value to the firm early in their careers" in return for greater benefits in later years.
>
> Most important for present purposes, to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend. That is because such a rule would substitute a complex case-specific "accommodation" decision made by management for the more uniform, impersonal operation of seniority rules. Such management decisionmaking, with its inevitable discretionary elements, would involve a matter of the greatest importance to employees, namely, layoffs; it would take place outside, as well as inside, the confines of a court case; and it might well take place fairly often. We can find nothing in the statute that suggests Congress intended to undermine seniority systems in this way. And we consequently conclude that the employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient.

535 U.S. 391, 404-05 (citations omitted).

The Supreme Court did note that certain "special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts." *Id*. at 405. Special

circumstances include showing "that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *Id*. They also include showing "that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter." *Id*. Other special circumstances may be present on a case-by-case basis. The burden is on the plaintiff to "explain why, in the particular case, an exception to the employer's seniority policy can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." *Id*. at 406.

Gazvoda argues that the 2010 agreement between CBP and the border patrol agents permits of deviation by CBP. Specifically, the following provision allows CBP to reassign personnel for reasons not governed by seniority:

> 3.3. Scope. This agreement is limited to vacancies that management chooses to fill under its specific terms, and does not affect any other types of transfers, reassignments or relocations. This agreement applies to inter- and intra-sector relocations. Nothing herein affects management's right "to make selections for appointments from among properly ranked and certified candidates for promotion; or any other appropriate source."

Vol'y Relocation Prog. Memo., Ex. 1, Att. A, ECF No. 36-1. This provision permits management to fill an open position without opening it to seniority bidding. Ostensibly, it allows for the compassionate transfer of a border patrol officer, even if that officer does not possess the requisite seniority to fill the position. No similar exclusion is present in the 2014 agreement but the two agreements govern different types of transfers, and an exclusion in one of the agreements would furnish the possibility of Gazvoda's relocation pursuant to the exclusion.

The next question, then, is whether there were open positions available that CBP could have filled with Gazvoda had it sought to exercise this discretion. Defendants do not contest that

there were positions available. Thus, Gazvoda is capable of demonstrating sufficient likelihood of success on the merits at the preliminary injunction stage to have the first factor weigh in his favor.

**B.**

The second issue left open in the Court's April 7 Opinion is whether Gazvoda would suffer from irreparable harm if injunctive relief is withheld. As the April 7 Opinion explained:

> [A]ssuming without deciding that Gazvoda's harm could be deemed irreparable, it would presume the fact of discrimination. That fact is inextricably intertwined with the question of whether Defendants could actually reasonably accommodate Gazvoda. That question will be answered by the discovery ordered above. Gazvoda's claim of irreparable harm is, currently, insufficient to sustain or defeat his request for a preliminary injunction and will be revisited following the limited discovery period.

Apr. 7 Op. 15, ECF No. 34. Now that it has been determined, for purposes of Gazvoda's motion for a preliminary injunction, that positions did indeed exist that he could have filled, the question of irreparable harm is ripe. Although the April 7 Opinion assumed, without deciding, that Gazvoda's harm could be deemed irreparable, that assumption must be set aside for a more concrete determination.

As the April 7 Opinion determined, the question of irreparable harm "is inextricably intertwined with the question of whether Defendants could actually reasonably accommodate Gazvoda." The more accurate observation is that the question of *harm* is inextricably intertwined with the question of position availability. If there was nowhere for Gazvoda to be transferred, he was not harmed by having his transfer request denied. Now that it has been determined that he was indeed harmed, the question becomes whether the character of that harm justifies equitable relief or if money damages provides adequate potential relief for Gazvoda? Put more simply, will

the harm that Gazvoda suffers from being discriminated against be irreparable,[4] such that money damages cannot make him whole?

Although Gazvoda's claim of disability is particularly unique—he is a combat veteran suffering from PTSD—he has not explained how discrimination on the basis of this disability is any different from other victims of employment or disability discrimination. Indeed, many of those victims, if they prove their case, will have suffered from the same stigmatizing psychological harm of having been singled out for their distinguishing factor (their race, gender, disability status, etc.). While that discrimination surely inflicts damages beyond mere lost wages, the American legal system has long accounted for such harms through the provision of compensatory damages. Compensatory damages are available under the Rehabilitation Act. *Johnson v. City of Saline*, 151 F.3d 564, 573 (6th Cir. 1998). As the Seventh Circuit held in *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 300 (7th Cir. 2000), it has been "long recognized that humiliation, embarrassment, and like injuries . . . constitute cognizable and compensable harms stemming from discrimination." The stigma Gazvoda fears does not fall outside of this category.

Thus, Gazvoda has not established that he faces irreparable harm if he is not awarded injunctive relief. This fact is sufficiently compelling to override his likelihood of success on the merits because injunctive relief is such a powerful remedy. The injunction entered in favor of Gazvoda will be dissolved and his motion for a preliminary injunction will be denied.

**IV.**

---

[4] It is important to note, and keep conceptually clear, that the relevant harm is the harm that Gazvoda will suffer as a result of being discriminated against on the basis of his mental illness. This is entirely different and separate from the mental harm Gazvoda alleges he will suffer if he is forced to return the Laredo. Gazvoda can avoid the latter harm by simply not reporting to Laredo. He argues that he cannot avoid the stigma of discrimination, however, because he will be fired after he does not report and the sole reason for his termination will be the fact that he is disabled. This stigma of discrimination is the harm Gazvoda claims is irreparable.

- 15 -

Accordingly, it is **ORDERED** that the Preliminary Injunction imposed on April 7, 2016 is **DISSOLVED**.

It is further **ORDERED** that Plaintiff Anthony Gazvoda's Motion for a Preliminary Injunction, ECF No. 2, is **DENIED**.

Dated: August 1, 2016          s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 1, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager