UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY A. GAZVODA,

      Plaintiff,       Case No. 15-cv-14099

v.              Honorable Thomas L. Ludington

SECRETARY OF HOMELAND SECURITY, and
COMMISSIONER OF UNITED STATES
CUSTOMS AND BORDER PROTECTION,

      Defendants.

_____/

## ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING MOTION FOR SANCTIONS

  Plaintiff Anthony Gazvoda filed a complaint against Defendants the Secretary of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP") on November 21, 2015. ECF No. 1. In the complaint, Gazvoda alleges that the Defendants wrongfully denied his request for a reasonable accommodation. Gazvoda is a veteran who suffers from Post-Traumatic Stress Disorder ("PTSD") and who requested reassignment from his post as a border patrol agent in Laredo, Texas, to Sault Ste. Marie, Michigan. Immediately after filing the complaint, Gazvoda filed a motion for a temporary restraining order or preliminary injunction. ECF No. 2. The Court denied Gazvoda's request for a temporary restraining order, but scheduled a preliminary injunction hearing and directed expedited briefing. ECF No. 5.

  The preliminary injunction hearing was held on January 26, 2016. Several days after the hearing, the Government filed a motion to dismiss. ECF No. 30. On April 7, 2016, the Court issued an opinion and order denying the motion to dismiss, conditionally granting the motion for a preliminary order, and resolving several other minor motions. ECF No. 34. In that order, the

Court explained that "Gazvoda's claim for preliminary injunctive relief (and perhaps his entire claim on the merits) depends on his ability to demonstrate that a position was available at the border patrol stations in Sault Ste. Marie and Port Huron." April 7, 2016, Op. & Order at 14, ECF No. 34. For that reason, the Court imposed a temporary injunction and opened discovery for one month into the availability of border patrol positions in Michigan during the relevant timeframe.

On August 1, 2016, the Court dissolved the temporary injunction and denied the motion for a preliminary injunction. ECF No. 38. Although open positions existed, the Court found that Gazvoda could be fully compensated for his alleged injuries via money damages. Accordingly, an injunction was not necessary to prevent irreparable harm.

Discovery then began. On December 14, 2016, the Government filed a motion for a protective order. ECF No. 52. In the motion, the Government requested a protective order precluding the depositions of Drs. Kirk Swabash, Robert Barger, and Craig Lemmen. The Defendants argued that the only issue before the Court would be "whether, *based on the information provided to U.S. Customs and Border Protection (CBP) at the time*, it improperly denied Plaintiff's accommodation request." Mot. Prot. Order at 1, ECF No. 52 (emphasis in original). The Court denied the motion for a protective order, finding that the information sought in the depositions was relevant to a number of potentially contested elements of Gazvoda's claim. ECF No. 57. Two weeks later, Gazvoda filed a motion for sanctions and attorney fees for defending against the motion for a protective order. ECF No. 58.

On April 3, 2017, the parties filed cross motions for summary judgment. ECF Nos. 63, 64. Because genuine issues of material fact remain, both motions for summary judgment will be denied. Gazvoda's motion for sanctions will likewise be denied.

# I.

Plaintiff Gazvoda joined the Michigan National Guard in 2001. Gazvoda Dep. at 8, ECF No. 64, Ex. 1. He applied for a position as a border patrol agent in 2007 and received a job offer in 2008. *Id.* at 9. However, because Gazvoda was in the process of deploying to Afghanistan, he was unable to accept the offer. *Id.* Gazvoda's tour in Afghanistan lasted from January to November of 2009. *Id.* at 10. While deployed, Gazvoda served as a "team leader for a route clearance platoon." *Id.* That platoon was tasked with clearing roads of improvised explosive devices and ambushes. *Id.* The route clearance typically occurred in rural areas. *Id.* at 11.

According to a report prepared by psychologist John Haskin, Gazvoda indicated that he experienced 34 firefights while in Afghanistan. Haskin Rep. at 6, ECF No. 64, Ex. 5. Haskin explains: "While he lost no personnel, he did see a number of severe injuries including seeing an arm blown off, a buddy shot through the shoulder, and another shot through the knee. He has a number of scars, two slipped discs, and suffered at least one concussion. . . . He has suffered from very bad headaches." *Id.*

## A.

After his tour, Gazvoda returned to Michigan. *Id.* Immediately after returning, Gazvoda experienced trouble sleeping, diagnosed as insomnia. *Id.* He saw psychiatrist Robert Barger. Barger Eval. April, 28, 2010, ECF No. 64, Ex. 2. Dr. Barger indicated that Gazvoda reported recurrent headaches, decreased concentration, "broken sleep with nightmares, hypervigilance, intrusive recollections, avoidance of crowds and certain triggers, irritability, and some emotional numbing." *Id.* at 2. Dr. Barger concluded that Gazvoda was suffering from combat-related PTSD. *Id.* at 2. Despite that diagnosis, Dr. Barger appeared to believe that Gazvoda's symptoms were not debilitating and that he was capable of moving south for employment as a border patrol

officer, assuming Gazvoda received treatment from the local VA in Texas. *Id.* at 2. Gazvoda applied for a border patrol position and was offered a position. On September 10, 2010, Gazvoda traveled to New Mexico for training. Gazvoda Dep. at 16. While training, Gazvoda did not experience any PTSD symptoms. *Id.* As part of the training, he became proficient in Spanish. *Id.*

Around April or May of 2011, Gazvoda was assigned to Laredo, Texas. *Id.* at 17. As a border patrol agent, Gazvoda was tasked with protecting the United States from "the illegal entry of aliens, terrorists, and terrorist weapons." *Id.* at 18. He was assigned to a particular border station and also manned a checkpoint approximately 30 miles from the border. *Id.* Gazvoda carried a weapon but never discharged it. *Id.*

Almost immediately upon moving to Laredo, Gazvoda began experiencing "severe panic attacks, particularly when sleeping." Haskin Rep. at 2; Gazvoda Dep. at 20. His insomnia worsened to the point where he was "awake all night or like an hour of sleep sporadic throughout the week." Gazvoda Dep. at 13. He suffered from consistent anxiety and experienced survivor's guilt stemming from experiences in Afghanistan. Haskin Rep. at 6. According to Gazvoda, these symptoms did not impact his job performance as a border patrol agent. Gazvoda Dep. at 26. However, his personal life was dramatically impacted. Gazvoda reports that he "just found myself pretty much just in my apartment after work." *Id.* at 27.[1] Gazvoda scheduled an appointment with a VA psychiatrist in Texas for July 20, 2011. *Id.* at 24. The appointment was scheduled for 8:00 a.m, and Gazvoda left without seeing the doctor around 9:00 a.m. *Id.*

In May 2011 (soon after moving to Laredo), Gazvoda applied for disability benefits through the VA. *See* Disability App., ECF No. 64, Ex. 3. Gazvoda listed PTSD, anxiety disorder, sleep disorder, bilateral hearing loss, and tinnitus as the disabling conditions he was suffering from. *Id.* Several months later, Gazvoda was evaluated by Dr. Gerwell in San Antonio, Texas.

---

[1] Gazvoda was living with his girlfriend (now wife) while stationed in Laredo. *Id.* at 74.

Dr. Gerwell Eval., ECF No. 64, Ex. 4.[2] According to that evaluation, Gazvoda described his symptoms as difficulty sleeping, emotional detachment, frequent panic attacks, and avoidance of stressful situations like crowds. *Id.* at 1. Dr. Gerwell described the symptoms as of moderate severity and indicated that they were "constant, continuous, or ongoing." *Id.* At the time Dr. Gerwell evaluated Gazvoda, he was not receiving treatment for his disorders. *Id.* Ultimately, Dr. Gerwell concluded that Gazvoda's symptoms met "the diagnostic criteria of PTSD." *Id.* at 5. She noted that Gazvoda had "difficulty falling or staying asleep, difficulty concentrating, irritability or outbursts of anger, hypervigilance and exaggerated startle response." *Id.* at 5–6. Dr. Gerwell opined that the "prognosis for the psychiatric condition is fair," but cautioned that "without treatment there is not likely to be improvement." *Id.* at 6. Gazvoda currently receives disability benefits from the VA. Benefits Letter, ECF No. 63, Ex. 13.[3] There is no record that Gazvoda received further treatment for PTSD while in Laredo. In December 2011, Gazvoda discussed his difficulties with his supervisor, who recommended that Gazvoda return to Michigan for a week and seek treatment. Gazvoda Dep. at 28. After requesting and receiving leave without pay (abbreviated as LWOP), Gazvoda returned to Michigan. *Id.* at 28–29.

## B.

Once back in Michigan, Gazvoda received treatment from Dr. Haskin and continued treatment with Dr. Barger. *Id.* at 29. Dr. Haskin evaluated Gazvoda three times during February and March of 2012. On March 24, 2012, Dr. Haskin issued a report summarizing his diagnosis and recommendations. Haskin Rep. at 1. Dr. Haskin indicated that the report was being prepared,

---

[2] The Government represents that this evaluation occurred because Gazvoda applied for VA disability benefits. That representation does not appear to be specifically corroborated by the record, but Gazvoda does not challenge its accuracy.

[3] A letter, sent on February 8, 2017, implied that Gazvoda has received disability benefits for an undisclosed period of time. *Id.* at 2. It also indicated that Gazvoda's PTSD currently warrants a 70% disability finding. *Id.* In the past, Gazvoda's PTSD represented a 50% disability. *Id.*

in part, to determine whether Gazvoda "might qualify for a compassionate transfer under U.S. Customs and Border Protection Guidelines." *Id.* The report explained that Gazvoda's sleep improved after he left Laredo, but that he still "confines himself to his home most of the time." *Id.* at 2.

Dr. Haskin found that Gazvoda's reported symptoms, appearance, actions, and responses were "clearly indicative" of a person "in the acute stages of severe Posttraumatic Stress Disorder." *Id.* at 3, 5, 8. For example, Dr. Haskin explained that Gazvoda reported agitation and obsessive/impulsive behavior. He further suggested that Gazvoda had a dissociative disorder and felt alienated. *Id.* at 4. Gazvoda was uncomfortable around people and, as a result, isolated himself. *Id.* at 5. Gazvoda's "move out of Laredo . . . produced some desired results," but Dr. Haskin reported that many of Gazvoda's PTSD symptoms continued presenting after the move.

Dr. Haskin specifically found that Gazvoda's "job as a Border Patrol officer in Laredo, TX has provided many significant cues that give rise to reactivating his trauma on a regular basis and led to deterioration of emotional, physical, and mental health." *Id.* at 8. Dr. Haskin went on to explain that

> [n]umerous aspects of the environment, both common in and unique to his Laredo placement, which are beyond anyone's control create visual, audio, tactile, and olfactory cues that trigger memories of similar situations, and generate automatic responses that impair Mr. Gazboda's [sic] mental health, physical well-being, and ability to function on the job. Some of these include climate and terrain, people who "look different" than those he sees in more comfortable situations, people who speak in a language that he does not readily understand, night ops similar to those in which some of his worst firefights took place, high tension related to drug trafficking and violence more severe than in most other border locations.

*Id.* at 9.

Dr. Haskin went on to opine that "the current level of treatment provided [to Gazvoda] by the VA is not adequate." *Id.* In fact, he found that "Gazvoda has neither the judgment nor the

physical, mental, or emotional energy required to perform the duties of a border patrol officer at this time. His impaired judgment, slow reactions, and anxiety could put himself, the public, and other officers in danger. In fact, we see him as unable to work in any capacity at this time." *Id.* However, Dr. Haskin opined that "[i]f Mr. Gazvoda receives adequate treatment, . . . he might be ready to return to work *at the same job but in a different work environment (location)* in as little as three to, more likely, six months." *Id.* (emphasis added). For that reason, Dr. Haskin recommended that Gazvoda be transferred "from Laredo to as dissimilar a setting as possible. . . . Most locations on the east or west coast or the Canadian border should provide sufficient differences to enable him to function well." *Id.* at 10 (emphasis omitted).

In his deposition, Dr. Haskin provided additional context for his report. Haskin Dep., ECF No. 63, Ex. 4. Dr. Haskin explained that individuals suffering from severe PTSD often "can't coherently put the pieces all together to explain to somebody exactly what's going on because you don't know." *Id.* at 9. Despite the fact that Gazvoda's symptoms thus included a lack of insight into his condition, Dr. Haskin noted that Gazvoda was frank and honest during the evaluation. *See id.* at 22. There was no indication that Gazvoda was malingering. *Id.*

Over the next several years, Gazvoda was evaluated by several other doctors.[4] As mentioned above, Gazvoda resumed treatment with Dr. Barger upon his return to Michigan. On July 16, 2012, Dr. Barger issued a statement: Gazvoda "has requested transfer from the southern border as part of his work as a Border Control Agent as the southern environment was a significant trigger for his PTSD given his previous experiences. It is my opinion that this request of transfer to the Northern environment would be extremely beneficial and appropriate." Barger Letter, ECF No. 46, Ex. C.

---

[4] Gazvoda also met regularly with social worker Tom Kirk during 2011 and 2012. Gazvoda Dep. at 53; Tr. Visits, ECF No. 65, Ex. 6.

Similarly, Gazvoda was examined by Dr. Martin Vandenakker on July 3, 2013.[5] Vandenakker Op., ECF No. 46 Ex. E. Dr. Vandenakker explained that Gazvoda had "developed classic symptoms of PTSD." *Id.* at 5. He further found a "clear relationship between job location placement, with unfamiliar and densely populated area, and exacerbation of his symptoms and continued deleterious affect." *Id.* He concluded: "I not only support the diagnosis of PTSD, but also support hardship transfer back to northern area where there are less environmental triggers, more familiarity." *Id.*

### C.

From December 17, 2011, to May 25, 2013, Gazvoda's requests for LWOP were granted. *See* AWOL Notification Letter at 1, ECF No. 64, Ex. 7. In a letter dated May 18, 2013, however, Gazvoda's request for leave from June 14, 2013, to July 14, 2013, was denied. *Id.* at 2. In the letter, CBP explained that the request for leave was denied because there was insufficient supporting medical documentation. The letter reflected that Gazvoda had submitted recommendations from Tom Kirk, a social worker Gazvoda had been meeting with, and Dr. Barger. CBP found the submitted medical documentation was insufficient for two reasons. First, CBP indicated that social worker Tom Kirk did not qualify as a medical authority and thus his recommendation could not be relied upon. Second, the letter discounted Dr. Barger's opinion because he simply recommended that Gazvoda be transferred to the northern border and did not state that "you 'can NOT go back to work in Laredo, Texas.'" *Id.* at 1. Gazvoda was ordered to report for duty in Laredo on June 14, 2013. When Gazvoda did not report, another letter was sent informing Gazvoda that he was absent without leave ("AWOL").

After receiving the first letter denying his request for leave, Gazvoda immediately contacted Dr. Barger. According to Dr. Barger's records, Gazvoda made the following request:

---

[5] According to Gazvoda, Dr. Barger referred him to Dr. Vandenakker at Gazvoda's request. Gazvoda Dep. at 46.

"'I need a letter that says I can NOT go back to work in Laredo Texas and that I have to work in Michigan, in a northern border state. It can't say 'recomend' [sic] last time Dr. Barger said he didn't 'recomend' [sic] that I work in Laredo but it has to say that I CAN'T work in Laredo, Texas.'" Barger Rec. at 2, ECF No. 64, Ex. 8. Dr. Barger then provided Gazvoda with an updated recommendation using the language Gazvoda requested. *Id.* at 3. Notwithstanding the update, Gazvoda's request for LWOP was not approved.

Despite being under standing orders to report to Laredo, Texas, Gazvoda remained in Michigan. On January 22, 2015, CBP sent Gazvoda a letter explaining that he was being placed on administrative leave. On May 23, 2015, CBP sent another letter wherein they explained that "the agency cannot allow your absence to continue indefinitely." March 23, 2015, Letter from Agency, ECF No. 64, Ex. 10. That letter presented Gazvoda with three options: return to work, request a reasonable accommodation, or resign. *Id.*[6]

In response to the letter, Gazvoda sought an accommodation. Gazvoda Dep. at 57. Gazvoda requested to be transferred to Sault Ste. Marie, Michigan. Accommodation Request, ECF No. 63, Ex. 6. To that end, he contacted Alicia Davila of the Customs and Border Protection's Office of Diversity and Civil Rights. *Id.* On May 19, 2015, Ms. Davila sent Gazvoda a letter confirming receipt of his request for a reasonable accommodation and directing Gazvoda to have his treating doctor complete a questionnaire attached to the letter. Davila Letter, ECF No. 64, Ex. 12. In response, Dr. Kirk Swabash[7] sent two letters to Ms. Davila. In both letters, Dr. Swabash indicated that Gazvoda was suffering from PTSD. He explained: "I am of the opinion

---

[6] The record reflects that, between leaving Laredo in 2012 and requesting a reasonable accommodation in 2015, Gazvoda twice requested a compassionate transfer to Sault Ste. Marie, Michigan. Both requests were denied. The Court previously found that any claims of discrimination arising out of the denial of the compassionate transfer request were not administratively exhausted. *See* Order. Deny Mot. Dismiss at 11, ECF No. 34. Accordingly, those denials are only tangentially relevant.

[7] In 2014, Dr. Barger transferred Gazvoda to Dr. Swabash. Dr. Swabash examined Gazvoda exclusively through teleconferences. Gazvoda Dep. at 54.

that there is a direct relationship between job location placement and direct exacerbation of his underlying disorder. Unfamiliar and densely populated areas will cause an exacerbation of his symptoms which, if continued, could have a deleterious effect on his general [physical] and mental health." Sec. Swabash Letter, ECF No. 46, Ex. A.

Gazvoda's request for a reasonable accommodation was then reviewed by the Chief Patrol Agent of the Laredo Sector, Mario Martinez. On June 26, 2015, Mr. Martinez sent Gazvoda a letter explaining that "the information gathered during the interactive process does not clearly indicate whether you have a disability that requires an accommodation, and if so, whether you can perform the essential functions of the job with or without an accommodation[.] . . . I have determined that a Fitness for Duty Examination (FFDE) is warranted." Martinez June 26, 2015, Letter, ECF No. 64, Ex. 13.

Gazvoda subsequently received both a physical and a psychiatric evaluation. During the physical evaluation, Gazvoda disclosed that he broke his back in 2004 and had metal rods inserted. *See* Physical Eval. at 3, ECF No. 64, Ex. 14. Gazvoda appeared to report occasional back pain related to that injury, but Gazvoda denied that he had significant physical restrictions. *Id.* at 6. Based on the evaluation, Gazvoda was found physically fit for duty as a border patrol agent.

Gazvoda also received a psychiatric evaluation by Dr. Craig Lemmen. Lemmen Eval, ECF No. 64, Ex. 15. The evaluation was conducted on October 19, 2015. Dr. Lemmen found that Gazvoda appeared "free from symptoms of any depressive disorder, anxiety disorder, or thought disorder." *Id.* at 3. According to Dr. Lemmen, Gazvoda indicated that he had loved his job as a border patrol agent in Laredo, but had struggled with PTSD while there. *Id.* at 4. When asked about current PTSD symptoms, Gazvoda "indicated that for a long time he couldn't go into

public places." *Id.* But Gazvoda indicated that his symptoms had improved since returning to Michigan: he "denied having any present nightmares" and "indicated that overall he felt he had a fairly mild case of PTSD." *Id.* When Dr. Lemmen asked whether Gazvoda believed he could work in Laredo again, Gazvoda said that "he probably could, although he had some apprehension that what happened before might happen again." *Id.* at 56.

Dr. Lemmen concluded that Gazvoda continued to suffer from PTSD, but concluded that "the severity of the condition is very mild." *Id.* at 8. He emphasized that Gazvoda "essentially denies all of those symptoms [of PTSD]" and noted that he did not witness any discomfort or tension in Gazvoda when discussing the triggering experiences in the past. *Id.* Dr. Lemmen opined "that Mr. Gazvoda can perform the essential functions of his position without regards to geographical location. By his report, and there is no evidence to the contrary, he did not have difficulties on the job when he was in Laredo, Texas." Dr. Lemmen acknowledged that "it is certainly possible that he would again have symptoms" if he returned to Laredo, but suggested that "they would likely be attenuated relative to his prior experience." *Id.* at 9. He concluded that a return to Laredo was very unlikely to produce symptoms that would "cause [Gazvoda] to be unable to perform his job in a safe manner." *Id.*

On November 16, 2015, CBP revoked Gazvoda's administrative leave and ordered him to report to Laredo, Texas. Nov. 16, 2015, Order Rep., ECF No. 63, Ex. 9. The order relied upon Dr. Lemmen's finding that Gazvoda could perform the duties of a border patrol agent without regard to geographic location. *Id.* Gazvoda alleges that, upon receiving the order to report to duty, his PTSD symptoms were aggravated and he sought emergency medical treatment. Compl. at 9. He further alleges that he received a doctor's order not to report to Laredo. *Id.* He relies upon ECF No. 46, Ex. G, to support these contentions, but the referenced document simply

asserts that Gazvoda "may return to work on 11/20/15" and does not identify the medical issues causing the work restrictions or mention Laredo, Texas. *Id.* Regardless, Gazvoda has not reported to Laredo to this day. Gazvoda Dep. at 67. Gazvoda filed this suit on November 21, 2015 and sought a temporary injunction or preliminary restraining order relieving him of the duty to report.

On January 5, 2016, Mr. Martinez sent Gazvoda a letter stating that "it appears that your impairments may substantially limit the major life activities of sleeping, concentrating, and thinking." Martinez Jan. 5, 2016, Letter at 2. But Mr. Martinez explained that "due to the operational needs of the Border Patrol in Laredo Sector, your request to transfer to Michigan poses an undue hardship." *Id.* Gazvoda's request for an accommodation was thus denied.

In his deposition, Mario Martinez provided additional details regarding his denial of Gazvoda's request for a reasonable accommodation. When asked to list the reasons he denied the request, Mr. Martinez explained that "there are a few." Martinez Dep. at 35, ECF No. 64, Ex. 17. He referenced the fact that Gazvoda refused to seek treatment or take medications while in Laredo. He also mentioned that Gazvoda had engaged in military-type activities while in Michigan, but had not experienced exacerbation of his PTSD symptoms. *Id.* at 36. Mr. Martinez opined that, Gazvoda had simply been suffering from "culture shock" in Laredo, which many new agents experience. *Id.* Mr. Martinez also faulted Gazvoda for apparently seeking an accommodation only to Michigan. Mr. Martinez explained that he had a great demand for border patrol agents in the Laredo area[8] and that there were a number of rural areas along the border in Texas where Gazvoda could have been assigned. But, according to Mr. Martinez, Gazvoda did

---

[8] Mr. Martinex explained that he is authorized to employ 1852 border patrol agents in the Laredo area but has been approximately 200-250 agents short during the relevant time frame. *Id.* at 38.

not put those options on the table. *Id.* at 37–38. There is no indication that CBP ever offered alternative accommodations.

**D.**

In March 2012, soon after Gazvoda moved back to Michigan from Texas, he rejoined the Michigan National Guard. Gazvoda Dep. at 32–33. A prerequisite for joining the Guard is the ability to be deployed overseas. At his deposition, Gazvoda was asked: "[I]n March 2012 when you switched back to the Michigan National Guard, were you deployable at the time?" *Id.* at 33. Gazvoda replied: "Yes." *Id.* Gazvoda was then asked if, in March 2012, he could have been deployed to Afghanistan, and Gazvoda confirmed that he would have been able to handle the deployment. *Id.* As part of his National Guard duties, Gazvoda traveled to Oklahoma, Minnesota, and Alabama. *Id.* at 25–26, 34, 69. At his deposition, Gazvoda indicated that those short trips did not trigger any PTSD symptoms. *Id.* While in the National Guard, Gazvoda served for a period of time as a counter-IED instructor. National Guard Eval. at 1–2, ECF No. 64, Ex. 18. *See also* Intel. Decisions App. at 3, ECF No. 64, Ex. 19. In an evaluation of Gazvoda's service, Gazvoda was found to be "mentally, physically and emotionally ready to lead in combat." *Id.* at 2.

On October 26, 2012, Gazvoda was offered a full-time position with Intelligent Decisions, Inc. Intel. Decisions App. at 12. Gazvoda was hired as a "Training and Simulation Trainer." *Id.* In that position, Gazvoda used virtual reality software to train soldiers to, among other things, detect IEDs and clear routes. Gazvoda Dep. at 72–73. From November 2014 to February 2015, Gazvoda worked as a counter-IED instructor for Booz Allen Hamilton. *Id.* at 55–57. In his deposition, Gazvoda did not suggest that any of these employment activities triggered his PTSD.

**E.**

As mentioned above, Gazvoda sustained a back injury and knee injury before being hired by CBP. Both were disclosed to CBP and did not prevent him from performing duties as a border patrol agent. Martinez Dep. at 41–42. Over the years, Gazvoda has suffered periodic back pain which occasionally results in temporary physical restrictions. *See* Phys. Restr. Rec. 1–4, ECF No. 64, Ex. 22 (documenting flare-ups in 2004, 2005, and 2007). In 2013, he was diagnosed with "stable mild . . . degenerative disc disease." Saginaw Med. Rec. at 2, ECF No. 64, Ex. 20. In 2015, he was diagnosed with "mild degenerative arthritis" in his right hip. *Id.* at 18.

In December of 2013, a physician completed a "Physical Restrictions and Limitation Form" which indicated that Gazvoda had been diagnosed with degenerative disc disease and had a number of physical restrictions. 2013 Phys. Restr. Form, ECF No. 64, Ex. 22. Among other limitations, that form indicated that Gazvoda could not carry or fire a weapon, could not ride in a military vehicle for 12 hours, and could not move forty pounds while wearing normal protective gear. *Id.* The form indicates that the "condition" was permanent, but was ambiguous regarding whether that meant the restrictions were permanent, or only the diagnosis of degenerative disc disease. *Id.* The form was provided to the National Guard.

On January 19, 2016, and October 13, 2016, two more physical restriction forms were completed and provided to the National Guard. *See* 2016 Phys. Restr. Forms, ECF No. 64, Ex. 22. The January report diagnosed degenerative disc disease, while the October report diagnosed lower back pain. Both reports indicated that Gazvoda had several physical restrictions, including the inability to ride in a vehicle for 12 hours or carry a forty pound duffel bag. Once again, the forms indicated that the "condition" was permanent. On February 28, 2017, Dr. James Byatt, who completed the January 19, 2016, form, wrote a letter indicating that the degenerative disc

disease was a permanent condition, but that the form was "[i]n no way . . . meant to indicate any form of permanent [physical] restriction." Byatt Letter, ECF No. 64, Ex. 24.

## II.

Both parties have moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

In his amended complaint, Gazvoda seeks relief under one theory: violation of the Rehabilitation Act, 29 U.S.C. §§ 701 *et. seq.* Claims brought under the Rehabilitation Act's anti-disability discrimination provisions are analyzed under the same standards applied to discrimination claims under the Americans with Disabilities Act. *See* 29 U.S.C. § 791(f). Gazvoda's claim alleges that Defendants did not reasonably accommodate his psychological disability.

Gazvoda seeks summary judgment, contending that there are no genuine issues of material fact on any elements of his claim. Defendants also seek summary judgment, arguing that Gazvoda has not established a prima facie case and is seeking an unreasonable accommodation. Defendants alternatively assert that the case should be dismissed for failure to exhaust administrative remedies. Plaintiff and Defendants both contend that the other did participate in the accommodation process in good faith. Because it is a threshold issue, the question of whether exhaustion was required will be addressed first. Second, the question of whether genuine issues of material fact exist on any elements of the claim will be examined. Finally, the question of whether the parties participated in the accommodation process in good faith will be resolved.

## A.

As an initial matter, Defendants argue that Gazvoda's claim should be dismissed because he did not exhaust his administrative remedies. Defendants raised this argument in their motion to dismiss, and the Court concluded that "Gazvoda's attempt to resolve this issue administratively would be futile and would result in yet another denial." Op. & Order Deny Mot. Dismiss at 10, ECF No. 34. Now, Defendants essentially request reconsideration of that decision, contending that a decision at the motion to dismiss stage may be revisited if discovery yields additional facts. *See McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000). Previously, the Court reasoned that "[s]ubjecting Gazvoda to a discrimination investigation pursuant to [the administrative process] would be needlessly duplicative of his original request for a compassionate transfer and his subsequent request for a reasonable accommodation." Op. & Order Deny Mot. Dismiss at 10. In a footnote, the Court continued: "It should be noted that the latter request was administered by the Customs and Border Protection's EEO office, the same entity he would engage if Gazvoda filed a claim of discrimination." *Id.* at

10 n.6. Defendants now contend that, although the same office would handle a discrimination investigation arising out of the reasonable accommodation denial, office regulations require a different person from the office to handle the investigation. That distinction is not sufficient to overcome the Court's prior finding of futility. Defendants' EEO office was apprised of the relevant facts and declined to accommodate Gazvoda. Given Defendants' consistent and vigorous opposition to all of Gazvoda's requests for accommodation or transfer, there is no reason to believe that a different decision maker within the EEO office would arrive at a different conclusion now.

Additionally, both parties have expended considerable time and effort in litigating this case. Generally speaking, administrative exhaustion requirements are meant to conserve judicial resources, promote inexpensive dispute resolution, and ensure a robust factual record for judicial review. But, at this point, dismissal of the case would result in a greater expenditure of resources than adjudication. Dismissal would simply prolong the dispute and increase the costs to the parties. Likewise, the factual record is sufficiently developed to allow for adjudication at this time. Thus, the policies which generally favor the administrative remedies exhaustion requirement here weigh strongly against it. Because an attempt to exhaust administrative remedies would be futile, the suit will not be dismissed on that ground.

**B.**

Gazvoda's claim involves direct evidence of discrimination. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). The following framework applies to claims involving direct evidence:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a

proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id*. at 869 (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)).

## 1.

Defendants do not appear to contest that Gazvoda's PTSD constitutes a disability.[9] Rather, Defendants contend that Gazvoda's physical limitations preclude him from performing essentials functions of the border patrol agent job. But Defendants' argument is misleading. Under the statute, a "'qualified individual with a disability' is defined as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004) (quoting 42 U.S.C. § 12111(8)).

In support of their contention that Gazvoda is physically unable to perform border patrol agent duties, Defendants rely upon physical restriction forms that were submitted to the Michigan National Guard during the time his reasonable accommodation request was pending. All parties agree that Gazvoda suffered a back injury in 2004 and disclosed that injury to Defendants before being hired as a border patrol agent. Upon his return to Michigan, Gazvoda reported physical restrictions to the Michigan National Guard on several occasions. In December 2013, Gazvoda provided the National Guard a form which indicated that he had been diagnosed

---

[9] And, given the record, they could not reasonably do so. Under the ADA a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 675 (7th Cir. 1998) (quoting 42 U.S.C. § 12102(2)). PTSD can create that kind of significant impairment. 29 C.F.R. § Pt. 1630, App. Importantly, PTSD "that is episodic or in remission is a disability if it would substantially limit a major life activity in its active state." *Id.* Gazvoda currently receives disability payments from the VA which are based, at least in part, on his PTSD. Drs. Gerwell, Haskin, Barger, Vandenakker, and Swabish all found that Gazvoda's PTSD was affecting his functioning to at least some extent. In particular, Gazvoda's anxiety, withdrawal from others, and difficulty sleeping are consistent themes. And most importantly, CBP itself appeared to concede that Gazvoda was suffering from a disability in its denial of his request for accommodation. In that letter, Mr. Martinez explained that "it appears your impairments may substantially limit the major life activities of sleeping, concentrating, and thinking." Martinez Jan. 5, 2016, Letter at 2.

with degenerative disc disease and was unable to carry or fire a weapon or move 40 pounds at least 100 yards. 2013 Phys. Restr. Form, ECF No. 64, Ex. 22.[10] The form indicated that the condition was "permanent." *Id.* Forms which indicated the same restrictions were also completed on January 19, 2016, and October 13, 2016. *See* 2016 Phys. Restr. Forms, ECF No. 64, Ex. 22.[11] If those physical restrictions were permanent, Gazvoda would not be able to perform all essential functions of the job. *See* Martinez Decl. at 2–3, ECF No. 64, Ex. 21 (explaining that a border patrol agent must be able to engage in extended walking, running, and swimming, lift forty pounds, and carry a firearm in order to safely and effectively work as a border patrol agent).

But, on their face, the forms are ambiguous as to whether the "permanent" checkbox refers to the underlying medical condition or the physical limitations. And Dr. Byatt, who prepared the January 19, 2016, form, has clarified that the listed physical restrictions were temporary. Byatt Letter, ECF No. 64, Ex. 24.[12] The implication is that Gazvoda's disc disease and arthritis would not prevent him from carrying a weapon or lifting forty pounds at all times. Although Gazvoda has a history of back pain outbursts, that is not necessarily disqualifying for a border patrol agent. *See* Martinez Dep. at 43–45. And Gazvoda was found fit for service during Defendants' own physical evaluation in September 2015. Although Gazvoda did not disclose that he had been diagnosed with mild arthritis at that evaluation, he did disclose his history of back issues. For that reason, the examining physician would have known to explore whether Gazvoda's back problems created physical limitations. Because Gazvoda was certified as fit for

---

[10] Medical records indicate that the degenerative disc disease was "mild" and "stable." Saginaw Med. Rec. at 2, ECF No. 64, Ex. 20.

[11] As previously mentioned, Gazvoda was also diagnosed with mild arthritis in his hip in 2015.

[12] Defendants contend that this letter is inadmissible under Federal Rule of Civil Procedure 37(c) because Gazvoda did not disclose the information in a timely manner. But, even if Rule 37(c) was violated, the evidence can be relied upon if the "failure was substantially justified or is harmless." At the settlement conference (held in February 2017), the Government represented that it had just discovered the physical restriction forms. Given the late stage at which the issue of Gazvoda's physical restrictions arose, the nondisclosure of the letter appears substantially justified. On the facts presented, there is no evidence of bad faith or purposeful obfuscation. More importantly, the Court concludes that, even ignoring the letter, the forms are ambiguous.

service, the physician apparently found none. However, the record is unclear regarding whether Gazvoda's arthritic hip might affect his ability to perform the duties of a border patrol agent. The record is also unclear regarding the frequency and severity of flare-ups which Gazvoda experiences. Gazvoda has proffered a letter from the National Guard indicating that he currently meets the physical fitness requirements for a position as a heavy equipment operator. *See* Phys. Fit. Letter, ECF No. 63, Ex. 15. Because the letter does not specify what the physical requirements for that position are, it is of limited relevance. But it is at least consistent with Gazvoda's argument that he has no permanent, substantial physical limitations from his back and hip conditions.

Defendants suggest that the inconsistencies in the record reflect a tendency on Gazvoda's part to make self-serving statements to physicians. But that is exactly the kind of credibility determination which is reserved for juries and should not be made at summary judgment. On this record, there is a genuine issue of fact regarding Gazvoda's physical ability to perform the job of a border patrol agent.[13]

## 2.

Defendants next contend that Gazvoda has not demonstrated a need for an accommodation. In making this argument, Defendants consistently challenge the legitimacy of Gazvoda's purported reasons for requesting the reassignment to Michigan. They assert that this Court may reject medical opinions that are contrary to undisputed factual evidence. But the weight of the medical evidence supports, and indeed suggests, the need for a transfer. There are contradictory assertions within the record whereby a fact finder might reasonably conclude that

---

[13] Given this genuine issue of fact, summary judgment cannot be granted for Gazvoda. Because Defendants are also seeking summary judgment, the remaining elements of the reasonable accommodation claim will be analyzed. If Gazvoda cannot demonstrate at least a genuine issue of fact as to each element, summary judgment for Defendants must be granted.

the accommodation was not needed. But that contradictory factual evidence is not so conclusive as to negate the issue of fact. Rather, Defendants' argument is a thinly-veiled invitation for this Court to play doctor and second guess the diagnosis and recommendations of several physicians. For the reasons stated below, the Court declines that invitation.

**i.**

It is helpful to summarize the medical opinions in the record. First, every physician that has examined Gazvoda agrees that he suffers from PTSD, except for one physician who diagnosed him with an anxiety disorder. Second, four physicians have recommended that he be transferred to the northern border. In 2012, Dr. Haskin found that Gazvoda was "in the acute stages of severe" PTSD. Haskin Rep. at 3. He specifically stated that Gazvoda was completely unable to work at the time, but would be able to return to work within six months if he received treatment and was assigned to a different location. *Id.* at 9. He recommended that Gazvoda be transferred "from Laredo to as dissimilar a setting as possible." *Id.* Dr. Haskin identified some of the triggers for Gazvoda's PTSD: "climate and terrain, people who 'look different' than those he sees in more comfortable situations, people who speak in a language that he does not readily understand, night ops similar to those in which some of his worst firefights took place, high tension related to drug trafficking and violence more severe than in most other border locations." *Id.*

Several months later, in July 2012, Dr. Barger found that "the southern environment was a significant trigger for his PTSD given [Gazvoda's] previous experiences." Barger Letter. He opined that "transfer to the Northern environment would be extremely beneficial and appropriate." *Id.* A year later, Gazvoda was examined by Dr. Vandenakker, who found a "clear relationship between job location placement, with unfamiliar and densely populated area, and

exacerbation of his symptoms and continued deleterious affect." Vandenakker Op. at 5. He recommended "hardship transfer back to northern area where there are less environmental triggers, more familiarity." *Id.* In 2015, Dr. Swabish sent Defendants a letter. Swabish Letter, ECF No. 63, Ex. 18. In the letter, Dr. Swabish explained that Gazvoda's "[l]imitations are substantial and at times can limit his functioning[.] . . . His impairment is suspected to be lifelong." *Id.* He recommended that Gazvoda "be stationed where there are less environmental triggers and more familiarity, near his treating VA office and family support system." *Id.*

Only two doctors did not, after evaluating Gazvoda, suggest transfer to the northern border. After Gazvoda applied for VA disability benefits in 2011, he was evaluated by Dr. Gerwell. She found that Gazvoda had difficulty sleeping, exhibited emotional detachment, experienced frequent panic attacks, and avoided stressful situations. Gerwell Eval. at 1. She diagnosed him with PTSD, concluding that his symptoms were of moderate severity. *Id.* at 1, 5. Because not presented with the question, Dr. Gerwell did not opine on whether transfer to the northern border would improve Gazvoda's symptoms. For that reason, her evaluation is of limited relevance in determining whether the requested accommodation was necessary.

The only contradictory medical evidence upon which Defendants can rely is Dr. Lemmen's October 19, 2015, evaluation. Dr. Lemmen concluded that Gazvoda suffered from "very mild" PTSD, but apparently based that conclusion almost entirely upon Gazvoda's self-reported lack of symptoms. Lemmen Eval. at 8. According to Dr. Lemmen, Gazvoda believed that he had a "fairly mild case of PTSD" and believed he "probably could" work in Laredo again. *Id.* at 6. Relying upon the fact that Gazvoda "essentially denies all of those symptoms" and that Gazvoda did not appear physically uncomfortable when discussing his triggers, Dr. Lemmen concluded that Gazvoda could work as a border patrol agent without regards to location. *Id.* at 9.

In combination with other evidence in the record, Dr. Lemmen's evaluation is sufficient to demonstrate a genuine issue of fact regarding whether the accommodation was needed. But, for the following reasons, is not sufficient to conclusively demonstrate that Gazvoda did not need the accommodation. First, it does not appear that Dr. Lemmen adequately considered Gazvoda's entire medical history. In his report, he indicates that he reviewed Dr. Haskin's report and Dr. Vandenakker's report. *Id.* at 2. There is no indication that Dr. Lemmen reviewed any of Dr. Barger's evaluations, Dr. Swabish's reports, or Dr. Gerwell's conclusions.[14] And, although Dr. Lemmen reviewed Dr. Haskin's report, he does not specifically explain why he is coming to a contradictory conclusion. *See id.* at 7 (summarizing some of Dr. Haskin's findings but not explaining why they were discounted). The only sentence which provides context for Dr. Lemmen's rejection of the contradictory medical evidence is as follows: "There has been a significant passage of time since he worked in Laredo and the natural history of PTSD is that is [sic] gets better over time. His clinical presentation suggests that is the case for him as well." *Id.* at 9.[15]

It is certainly possible that, by the time Gazvoda requested a reasonable accommodation, his PTSD symptoms had improved to the point where service in Laredo would not be debilitating. But Dr. Lemmen evaluated Gazvoda only once, and appeared to base his conclusions solely on Gazvoda's self-reporting of the lack of symptoms and Gazvoda's physical appearance during the encounter. In contrast, Drs. Barger and Swabish both had an extended treatment history with Gazvoda (albeit at least partially via teleconference). Dr. Swabish's letter,

---

[14] It appears that Gazvoda may have informed Dr. Lemmen that he had been evaluated by those doctors, but Dr. Lemmen's report simply summarizes the treatment history and does not engage with the underlying diagnosis or recommendations. *See id.* at 5–6.

[15] In his deposition, Dr. Haskin testified that, in his experience, PTSD does not generally get better over time without treatment. *See* Haskin Dep. at 85–87. He further supported that assertion by referencing peer reviewed publications discussing PTSD and the consensus among "the broader psychological community." *Id.* at 87.

prepared only a few months before Dr. Lemmen's evaluation, indicated a belief that Gazvoda's limitations would be "lifelong" and that there were environmental triggers specific to Laredo. Swabish Letter. More importantly, Defendants attach to their motion for summary judgment primary care notes from a Dr. Newhouse. Newhouse Notes, ECF No. 64, Ex. 27. Those notes reflect that Dr. Newhouse examined Gazvoda four times during the fall and winter of 2016. Dr. Newhouse notes that Gazvoda is experiencing "[a]djustment disorder with anxiety" and specifically stated that he "would concur with Dr Swabish that [Gazvoda] is not able to return to his prior work." *Id.* at 1–2.

Additionally, Dr. Haskin explained in his deposition that individuals suffering from PTSD often are unaware of the triggers for their symptoms. *See* Haskin Dep. at 16–18, 32. He further explained that individuals with PTSD might deny symptoms and pretend they do not suffer from the disorder. *See, e.g., id.* at 42 ("Nobody wants it. You don't want it. And, again, what is one of the criteria of PTSD is you avoid dealing with this stuff.").

**ii.**

Given this medical record, there is a genuine issue of fact regarding whether Gazvoda's requested accommodation was necessary. Several physicians, before and after Gazvoda requested the accommodation, opined that a transfer to the northern border was necessary (or at least likely to assist in recovery). One physician, in an evaluation conducted several months after the accommodation request, concluded that Gazvoda did not require an accommodation. Because Dr. Lemmen's evaluation was conducted immediately after the accommodation request and unequivocally concluded that accommodation was not necessary, that evaluation could support judgment for Defendants. But there are reasons to question Dr. Lemmen's conclusions. As discussed above, the weight of the medical evidence suggests that an accommodation was

appropriate. The physicians which had a long-term treating relationship with Gazvoda all concluded that transfer was needed. Given Dr. Swabish's and Dr. Barger's ongoing treatment relationships with Gazvoda, a reasonable fact finder could attribute more weight to their conclusions. Further, Dr. Lemmen's reliance on Gazvoda's statements about the lack of symptoms could be challenged because denial about symptoms is itself a symptom of PTSD. Given the contradictory medical evidence, neither party has demonstrated the absence of a genuine issue of fact on this element.

Defendants argue that, despite the competing medical opinions, the "law requires only that an employer rely on an objectively reasonable opinion." Def. Resp. Mot. Summ. J at 14, ECF No. 67. As a statement of law, that proposition is correct. As the Sixth Circuit has recently explained: "Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015). *See also Crocker v. Runyon*, 207 F.3d 314, 319 (6th Cir. 2000) ("Even if the earlier medical opinions were demonstrably flawed, the Postal Service's reasonable reliance upon them is not discriminatory.").

Given the weight of the medical evidence, it is questionable whether the Defendants could have reasonably and in good faith relied solely on Dr. Lemmen's conclusions in denying the accommodation request. In *Michael* and *Crocker*, the defendant was relying on substantial medical evidence which indicated that the plaintiff could not safely do the job. The Court in *Michael* explained that the law did not require the defendant to take the risk that the plaintiff was unfit to work even if the plaintiff *might* be able to safely work. 808 F.3d at 309. But here, Dr.

Lemmen's report was in contradiction to other evaluations which concluded that Gazvoda could not safely serve in Laredo. In contrast to *Michael*, where reasonable reliance on contested medical evidence would reduce the risk to the plaintiff and others, reliance on Dr. Lemmen's recommendation would have potentially increased the risk to Gazvoda and others.

More importantly, the Defendants did not *actually* rely upon Dr. Lemmen's report to deny the accommodation request. In the letter denying Gazvoda's request for accommodation, Mr. Martinez acknowledged that "it appears that your impairments may substantially limit the major life activities of sleeping, concentrating and thinking." Martinez Jan. 5, 2016 Letter at 2. Mr. Martinez went on to indicate that "both Dr. Swabash and Dr. Lemmen indicate that you may be capable of performing the essential functions of a BPA with or without accommodation." *Id.* The basis for the denial was that Gazvoda's "request to transfer to Michigan poses an undue hardship," instead of a conclusion that Gazvoda was not disabled or "otherwise qualified" for the position. *Kleiber*, 485 F.3d at 868. Thus, the Defendants did not actually rely on Dr. Lemmen's evaluation to deny the accommodation request. Rather, they relied upon an alternative basis: the undue hardship an accommodation would pose. Regardless of whether Defendants could have reasonably relied solely on Dr. Lemmen's report, they did not do so.

### iii.

Defendants further argue that the medical evaluations recommending transfer to the northern division should be disregarded because Gazvoda's actions since returning to Michigan are inconsistent with that accommodation request. First, Defendants point to Gazvoda's indication that he could be deployed to Iraq. *See* Gazvoda Dep. at 33 ("[Q:] [I]n March 2012 when you switched back to the Michigan National Guard, were you deployable at that time? [A:] Yes. [Q:] So you could have been deployed back to Afghanistan and you feel like you were able

to handle that? . . . [A:] Yes."). Defendants also rely upon Gazvoda's work as a counter-IED instructor over the past few years. In essence, Defendants contend that "[n]o reasonable factfinder could believe that Plaintiff's PTSD required a transfer from Laredo because it *reminded* him of Afghanistan, while at the same time he could return to combat *in Afghanistan*." Def. Mot. Summ. J. at 17 (emphasis in original).

These facts provide support for Defendants' contention that no accommodation is needed, but they fall short of justifying summary judgment for Defendants. As regards the contention that Gazvoda could return to Afghanistan without experiencing debilitating PTSD symptoms, Defendants rely solely on Gazvoda's statements in his deposition. Gazvoda did not indicate that he actually communicated to the National Guard that he could be deployed. Rather, Gazvoda simply agreed that National Guard members had to be deployable and that he could have handled deployment. *Id.* at 33. But there is no evidence in the record that any doctor examined Gazvoda and certified that he was capable of deploying to Afghanistan. As discussed above, those suffering from PTSD have a tendency to be oblivious to symptoms or act as if they do not experience PTSD. Thus, Gazvoda's deposition testimony does not conclusively establish that an accommodation is unnecessary.

Similarly, the fact that Gazvoda has worked as a counter-IED trainer is not necessarily inconsistent with the accommodation request. When asked about Gazvoda's work training others to detect and defuse IEDs, Dr. Haskin explained that the training "could have been very therapeutic for him." Haskin Dep. at 129. Dr. Haskin acknowledged that such work suggested improvement on Gazvoda's part, but consistently asserted within the same deposition that he still believed Gazvoda should not return to Laredo. *See, e.g., id.* at 134, 136. Gazvoda's work as an instructor provides some support for Defendant's argument that an accommodation is

unnecessary, but (in the face of the contradictory medical evidence) is not enough to warrant summary judgment for Defendants.

Next, Defendants argue that Gazvoda's request for a transfer to Sault Ste. Marie, specifically, was not medically required. In support of that contention, Defendants state that Gazvoda has "traveled regularly outside of Michigan while on leave from CBP without incident." Def. Mot. Summ. J. at 17. Defendants further challenge the legitimacy of several of the purported reasons that Gazvoda and his doctors identified Sault Ste. Marie as a recommended transfer location. Specifically, Defendants argue that Gazvoda was not actually familiar with Sault Ste. Marie, that he had no demonstrated need to be near his providers, and that Sault Ste. Marie has a similar population density and number of nonnative language speakers as Laredo, Texas.[16]

These arguments miss the mark. Defendants' argument appears to proceed as follows: even assuming that an accommodation of some kind was necessary, Gazvoda did not establish that a transfer to Sault Ste. Marie was the only possible accommodation. But this reasoning misconstrues the relevant standard. CBP had at least partial responsibility for identifying accommodating positions. The Sixth Circuit has summarized the standard as follows: "although employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose, or apply for, particular alternative positions for which they are qualified." *Burns v. Coca-Cola Enterprises*, Inc., 222 F.3d 247, 258 (6th Cir. 2000). In other

---

[16] Defendants also contend that, in May 2013, Dr. Barger "opined Plaintiff could return to work . . . unrestricted." Def. Mot. Summ. J. at 19. Defendants cite to Dr. Barger's records, ECF No. 64, Ex. 8. Those records reflect that on May 21, 2013, Dr. Barger stated in a letter that "Patient may return to work on May 21, 2013." *Id.* at 4. The next day, Gazvoda contacted Dr. Barger's office. According to the records, Gazvoda requested that the letter be amended to state that Gazvoda could not return to Laredo. *Id.* at 2. Gazvoda specifically mentioned Dr. Barger's July 16, 2012, letter where Dr. Barger stated that Laredo "was a significant trigger for his PTSD" and recommended transfer to the northern border. Barger Letter, ECF No. 46, Ex. C. Because Dr. Barger had already recommended that Gazvoda be transferred, there is nothing nefarious about Gazvoda's request, in 2013, for a clarifying addendum which confirmed that transfer was necessary. Defendants' suggestion that Gazvoda manufactured this aspect of Dr. Barger's letter is disingenuous and uncharitable to Dr. Barger.

words, the plaintiff appears to bear the initial burden of identifying one (or more) "particular positions to which he could be reassigned based on his qualifications," *id.* at 259, but then the employer must "'make a reasonable effort to explore the possibilities.'" *Id.* at 258 (quoting *Miller v. Illinois Dep't of Corr.*, 107 F.3d 483, 486 (7th Cir. 1997)). This requirement makes good sense: "The employer will often know more about the feasibility of such adaptations than the employee." *Miller*, 107 F.3d at 486. *See also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

As discussed multiple times already, Gazvoda's doctors consistently found that living in Laredo had exacerbated his PTSD symptoms and consistently recommended that he be transferred to the northern border. It is unclear whether Gazvoda or his doctors identified Sault Ste. Marie as a potential transfer destination, but Gazvoda has presented medical evidence which confirms that some doctors believe that a transfer to Sault Ste. Marie would be beneficial. Gazvoda is from Michigan originally and has family in the area. Gazvoda's doctors consistently indicated that relocating to a more "familiar" location would ease his symptoms. *See, e.g.*, Vandenakker Op. at 5; Haskin Rep. at 10. Gazvoda's doctors also suggested that transitioning to an area with a lower population density than Laredo, like Sault Ste. Marie, would be beneficial. Given the fact that Gazvoda's symptoms have improved after relocating back to Michigan, there is reason to believe that the medical rationale for transfer back to Michigan was accurate.[17] Defendants contend that there were other locations on the southern border which had similarly low population densities. Def. Mot. Summ. J. at 18. That may be true, but there is no indication

---

[17] Defendants spend considerable time arguing that there are significant dissimilarities between Laredo and Afghanistan such that a transfer to Michigan would not resolve the underlying PTSD triggers. But this argument ignores the medical opinions which find that transfer to Michigan would be helpful and, more importantly, the fact that Gazvoda's time in Michigan has apparently resulted in some improvement of his symptoms.

that Defendants ever presented those alternatives to Gazvoda. As discussed above, it was their burden to do so, since Gazvoda had identified a potential accommodation.

Additionally, Gazvoda's behavior—which Defendants contend establishes that no accommodation is necessary—could be interpreted as evidence that Gazvoda's PTSD is in remission. In other words, Gazvoda's doctors have concluded that living in Michigan is important to efforts to ameliorate his PTSD. Based on those recommendations, he has moved to Michigan and refused to comply with orders to return to Laredo. He has now lived in Michigan for several years, and his PTSD symptoms have improved. The improvement might indicate that an accommodation is unnecessary, but it also could support the theory that the move (and requested accommodation) has had exactly the intended and expected impact. When determining whether an individual is disabled, that determination "shall be made without regards to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2(j)(vi). Likewise, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* at § 1630.2(j)(vii). The Appendix to Part 1630 of the Code of Federal Regulations indicates that § 1630.2(j)(vii) was promulgated " 'to reject the reasoning of court decisions concluding that certain individuals with certain conditions—such as epilepsy or post traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent.'" 29 C.F.R. § Pt. 1630, App. (quoting Joint Hoyer–Sensenbrenner Statement at 2–3). *See generally Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990) (explaining in the social security disability context that the claimant's ability to work during periods of remission was not evidence that he was not disabled); *Rader v. Upper Cumberland Human Res. Agency*, 171 F. Supp. 3d 751, 758 (M.D. Tenn. 2016) (noting that 2008 amendments

to the ADA clarified that an a impairment that is episodic or in remission is a disability if it would be substantially limiting when active).

A reasonable jury could conclude that Gazvoda's improved functioning since his return to Michigan is evidence that his requested accommodation was justified, not that he longer needs it. Rather, as several of Gazvoda's doctors have opined, a return to Laredo might result in a "relapse" of his PTSD symptoms. As § 1630.2(j(vii) and the related legislative history makes clear, an individual should not be required to cease "treatment" and return to a situation that originally exacerbated symptoms simply because the elimination of the triggering circumstances has led to improvement. A reasonable jury could conclude that the evidence demonstrates the efficacy of the request accommodation, rather than supporting the conclusion that it was medically unnecessary.

**3.**

Next, Defendants argue that Gazvoda's requested accommodation is unreasonable as a matter of law. Gazvoda bears the burden, as an initial matter, of "'showing that the accommodation is objectively reasonable.'" *Hedrick*, 355 F.3d at 457 (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 (6th Cir. 1998)). The statute specifically lists "reassignment to a vacant position" as a reasonable accommodation. 42 U.S.C. § 12111(9)(B). Defendants contend that the requested accommodation is unreasonable for two reasons.

First, Defendants argue that the requested transfer is unreasonable because Gazvoda would still be exposed to foreign language speakers in Michigan. "An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (emphasis in original). In determining whether a requested accommodation will be effective, courts should consider "the limitations indicated by the

doctors." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 984 (6th Cir. 2011). If the proposed accommodation fails "to comply with the physician-mandated restriction[s]" it is unreasonable because it will be ineffective. *See Horn v. Knight Facilities Mgmt.-GM, Inc.*, 556 F. App'x 452, 455 (6th Cir. 2014).

Defendants contend that Gazvoda's PTSD can be triggered by overhearing foreign language speakers, which is true, and that moving to Michigan will not eliminate his exposure to foreign languages. As Defendants assert, Gazvoda's PTSD was triggered in one instance while in Michigan because he overheard Middle Eastern translators at the National Guard base. *See* Gazvoda Dep. at 50. Defendants also assert that Michigan has a large Middle Eastern population. That assertion is unsupported, but Gazvoda does not challenge it. Regardless of whether it is true that Gazvoda would experience foreign languages at a similar or greater level in Michigan than he did in Texas, Defendants' argument is unavailing. Gazvoda's doctors have identified multiple triggers for his PTSD besides exposure to foreign languages. In his deposition, Dr. Haskin explained that the existence of multiple triggers has a compounding and exponential effect. *See* Haskin Dep. at 63–65. That reasonable assertion implies that an accommodation which reduced exposure to certain triggers could be effective even if it did not eliminate exposure to *all* triggers. And Dr. Haskin's testimony is supported by the record: Gazvoda has apparently experienced an alleviation in his PTSD symptoms since returning to Michigan, which provides support for Gazvoda's assertion that the requested accommodation would be effective.

Next, Defendants argue that the accommodation request is unreasonable because Gazvoda is seeking transfer to "be away from a particular color, ethnic group, and/or foreign language speakers." Def. Mot. Summ. J. at 22. In response to an accommodation request, an employer is not "required to waive legitimate, non-discriminatory employment policies or

displace other employees' rights in order to accommodate a disabled employee." *Hedrick*, 355 F.3d at 457 (citing

*Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)). *See also Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) (rejecting as unreasonable two proposed accommodations because the first would have compelled the defendant to "permit an employee to post messages intended to demean and harass his co-workers" and the other "could have forced the company to exclude sexual orientation from its workplace diversity program").

Gazvoda's medical records indicate that his doctors believe one of his PTSD triggers is being around people who look different than him. For example, Dr. Haskin identified one of Gazvoda's triggers as "people who 'look different' than those he sees in more comfortable situations [and] people who speak in a language that he does not readily understand." Haskin Rep. at 9.[18] *See also* Vandenakker Notes at 2, ECF No. 64, Ex. 9 (referencing the fact that Laredo had a significant Hispanic population when mentioning that hearing unfamiliar languages had "impacted his symptoms"). In Dr. Haskin's deposition, he explained how he identified Gazvoda's triggers. Haskin Dep. at 108. Dr. Haskin explained that, in his report, he was "paraphrasing and summarizing what [Gazvoda] said. It does not mean he said those exact words." *Id.* at 109. When asked specifically about the possibility that exposure to people of a different color was a trigger, Dr. Haskin explained that Gazvoda "never used words of people of color. He did talk about language, you know, listening for a different - - hearing in a different language." *Id.* at 110. Dr. Haskin was then asked specifically whether the idea that people of

---

[18] Defendants also question the legitimacy of Gazvoda's request for a transfer because he is proficient in Spanish. They argue that, because he is proficient in Spanish, hearing Spanish could not trigger his PTSD. In his deposition, Dr. Haskin directly rejected that line of reasoning, explaining that PTSD can be triggered by hearing unfamiliar languages even if the hearer can understand the language. *See* Haskin Dep. at 66.

color triggered Gazvoda's PTSD came from Dr. Haskin or Gazvoda. Dr. Haskin indicated that "the using of the terms comes from me. It doesn't come from him." *Id.* at 112.

Earlier in the deposition, Dr. Haskin was asked whether there was "anything in the interview that would have led to you conclude racist tendencies or thoughts" on Gazvoda's part. *Id.* at 49. He replied: "No. Quite the opposite." *Id.* Dr. Haskin explained that, after an traumatic experience in a foreign land "with people who dress differently, look differently and where you cannot clearly tell who is an enemy[,] . . . it is pretty natural to be a little bit more sensitive to folks that act different, look different than you do." *Id.* at 50.

Given Dr. Haskin's explanation, Defendants have not established that the requested accommodation stems from discriminatory beliefs. Defendants have not conclusively shown that the sole reason (or even the predominant reason) that Gazvoda is seeking the transfer is to avoid people who look differently than him. In fact, Defendants' previous argument undermines the present argument: if Michigan has a large Middle Eastern population, then Gazvoda must not be seeking transfer to avoid contact with people of color. Gazvoda's doctors have identified a number of other triggers which are unique to Laredo. The "people of color" trigger appears to have been diagnosed by Dr. Haskin and is not necessarily indicative of racism on Gazvoda's part. Given the tendency by individuals suffering from PTSD to be triggered by unfamiliar situations or by visuals that are evocative of the traumatic experiences, Gazvoda's request for an accommodation is not unreasonable as a matter of law.

**4.**

Defendants further argue that summary judgment is appropriate because Gazvoda's requested accommodation would be an undue hardship for CBP. Once the employee establishes that a reasonable accommodation is possible, the employer bears the burden of proving that the

accommodation imposes an "undue hardship" on the employer. *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003). The ADA provides factors to consider in "determining whether an accommodation would impose an undue hardship":

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B).

Defendants argue that Gazvoda's request poses an undue hardship because "[w]hile CBP admittedly would not grind to a halt if Plaintiff were transferred, replacing a BPA entails significant cost as CBP would have to provide a complete background check, five months of training, and equipment costs to replace Plaintiff in Laredo." Def. Mot. Summ. J. at 24. Defendants further argue that transferring Gazvoda would be a hardship because "the Laredo Sector is significantly understaffed." *Id.* Defendants contend that if a PTSD diagnosis "becomes an avenue to get to the desirable northern border, it could have a devastating effect on CBP's ability to fill an already understaffed sector." *Id.* at 24–25.

In the August 1, 2016, opinion and order, the Court explained that Gazvoda had "identified a number of openings in . . . the Sault Ste. Marie border patrol station" during the relevant timeframe. Aug. 1, 2016, Op. & Order at 10, ECF No. 38. Defendants did not contest

that the openings existed, but contended that they could not have been used to accommodate Gazvoda because of seniority provisions in the agreement between CBP and the border patrol agents. The Court rejected that argument, finding that the agreement allowed for exceptions, including for compassionate transfers. *Id.* at 12. Defendants do not now assert that there were no open positions in Sault Ste. Marie during the relevant timeframe or attempt to reargue the seniority issue.

Plaintiff has thus carried his burden of proving that an accommodation was reasonable, and Defendants have not established that it would pose an undue hardship. It is true, as Defendants assert, that "Congress could not have intended the only limit on the employer's duty to make reasonable accommodation to be the full extent of the tax base on which the government entity could draw." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995). But Defendants do have significant resources, which is a relevant consideration under the statute. Defendants have not established that the requested transfer of one border patrol agent would be so expensive or impactful as to make it an undue hardship.

It must be noted that "[t]he ADA does not require an employer to offer an employee a promotion as a reasonable accommodation." *Hedrick*, 355 F.3d at 457. Likewise, an employer is not required to create a new position. *Kleiber*, 485 F.3d at 869. Defendants do not contend that Gazvoda's request would require either a promotion or the creation of a new position.[19] Accordingly, Defendants' arguments that replacing Plaintiff would entail training costs and equipment costs hold little weight. Because there were vacant positions in Sault Ste. Marie, Defendants would have had to bear the costs of training someone to fill the position regardless.

---

[19] Or at least, they do not argue that vacant positions meeting the requirements outlined above never existed during the relevant timeframe. It is unknown whether open positions are currently available. If not, Gazvoda may be limited solely to money damages, not injunctive relief. Because not addressed by the parties, this issue is left for another day.

Defendants offer no evidence that the costs of filling the vacant position would have been any higher for Gazvoda than for another kind of hire. To the contrary, common sense suggests that hiring an already-trained border patrol agent would reduce training costs. In other words, transferring Gazvoda from Laredo to Sault Ste. Marie might necessitate hiring and training a new agent in Laredo, but would obviate the need to train the new hire in Sault Ste. Marie. The mere fact that Gazvoda's replacement would have to be trained is not sufficient to make Gazvoda's requested transfer an undue hardship.

Defendants' second argument holds more weight. Mr. Martinez, who heads the Laredo Sector, testified that Laredo has consistently been understaffed. *See* Martinez Dep. at 38. No doubt, this is in part due to the fact that there is a much larger need for border patrol agents along the southern border. Mr. Martinez testified that he is authorized to employ 1,800 border patrol agents for the Laredo sector, but the sector typically has 200 or more open positions. *Id.* Defendants also express concern that, because 20% of the agents in Laredo are active service members or veterans, there might be a mass exodus out of Laredo if PTSD becomes an avenue for a transfer.

Defendants' concerns are reasonable, but they fall short of establishing an undue burden. There might have been many open positions in Laredo at the time Gazvoda sought a transfer, but Defendants have conceded that there were also open positions in Michigan. Thus, although there might be a *greater* need for agents in Laredo, Defendants cannot argue that there is *no* need for agents in Sault Ste. Marie. Perhaps it is easier for CBP to fill positions on the northern border than on the southern border, but that assertion has not been specifically supported by the record. And even if true, Defendants have not shown that a transfer for one border patrol agent, out of hundreds, constitutes an undue hardship.

To be sure, Defendants argue that granting Gazvoda a transfer might create a dangerous precedent. But this slippery-slope argument is not warranted by the record presented. Gazvoda's PTSD has been specifically and consistently documented by his doctors. Defendants provide no evidence regarding which percentage of the veterans employed by Defendants suffer from PTSD. Further, several of Gazvoda's doctors specifically found that specific environmental characteristics of Laredo were triggering his PTSD. For another agent to seek a transfer based on PTSD, he would likewise have to receive medical confirmation that his current posting was specifically triggering his condition. Finally, future transfers would be required only to the extent that there were open positions elsewhere. If Defendants' assertions about the limited needs on the northern border are true, then very few agents would be able to receive transfers to the border even if they established medical need. In other words, transfers would be required only so long as Defendants had openings on the northern border. This dynamic might result in no vacancies on the northern border and several more on the southern border, but Defendants have not shown that there are so many vacancies on the northern border that filling them with agents from the south would be an undue hardship in the aggregate. In short, Defendants have not sufficiently substantiated their assertion that transferring Gazvoda would constitute an undue hardship.

## C.

Finally, both parties argue that the other did not participate in the accommodation process in good faith. The ADA regulations provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). That

interactive process "'requires communication and good-faith exploration of possible accommodations.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir.2000) (en banc)). When this mandatory process breaks down, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). *See also Kleiber*, 228 F.3d at 1114. "If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would have been possible." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619 (N.D. Ohio 2014). Likewise, if the employee "refuses to participate in good faith or withholds essential information," the employer cannot be liable for failure to accommodate. *Id.*

Defendants argue that "Plaintiff selectively used medical documentation, often containing contradictory findings, to suit his purposes." Def. Mot. Summ. J. at 20. Specifically, Defendants fault Gazvoda for failing to inform them of his physical restrictions and allege that he did not disclose that his psychiatrist found that he no longer had PTSD. Nothing Defendants point to approaches bad faith on Gazvoda's part. The physical restrictions which Defendants mention were addressed above, in section B.1. As explained in that section, there is a genuine issue of fact regarding whether Gazvoda can physically perform the duties of a border patrol agent. But the most reasonable explanation for the physical restriction forms at issue is that Gazvoda has a permanent back (and hip) condition that results in occasional flare-ups which create temporary physical restrictions. Absent a showing that Gazvoda is permanently unable to physically perform the job, Gazvoda's nondisclosure of those physical restriction forms was not done in bad faith.

Defendants' argument that "a psychiatrist found he no longer has PTSD and does not require treatment" is disingenuous. Defendants cite to records from a Dr. Newhouse. *See* Newhouse Rec., ECF No. 27. In a notation dated September 27, 2016, Dr. Newhouse listed the "working diagnosis" for Gazvoda as "adjustment disorder with anxiety." *Id.* at 2. But the accompanying treatment notes reflect that Gazvoda continues to suffer from anxiety and exhibits some symptoms of PTSD (like avoidance of large crowds). *Id.* More importantly, Dr. Newhouse wrote a letter on October 4, 2016, where he stated: "I would concur with Dr. Swabish that he is not able to return to his prior work." *Id.* at 1–2. Simply put, the record does not say what Defendants argue it does. Dr. Newhouse diagnosed Gazvoda with an anxiety disorder. There is no indication he found that Gazvoda did *not* suffer from PTSD or that the anxiety disorder diagnosis was inconsistent with a PTSD diagnosis. More importantly, Dr. Newhouse also believes that Gazvoda should not return to Laredo. Thus, regardless of the specific reason why an accommodation is necessary, Dr. Newhouse agrees that Gazvoda should remain in Michigan. Far from being essential information that undermines Gazvoda's request for an accommodation, Dr. Newhouse's records bolster the request.[20]

Gazvoda also argues that Defendants did not engage in the accommodation process in good faith. First, he argues that Ms. Davila, a diversity civil rights officer in CBP's Protection's Office of Diversity and Civil Rights, violated certain CBP policies while considering Gazvoda's request for an accommodation. Even if true, Gazvoda has not explained how these technical violations of CBP regulations prejudiced him or established that strict compliance with internal

---

[20] Defendants provide other purported examples of bad faith conduct in their response to Plaintiff's motion for summary judgment. At best, these examples reflect inconsistencies in the record that Defendants could have resolved through a more diligent response to Gazvoda's accommodation request. The Court finds no evidence of purposeful obfuscation. Defendants, in particular, argue that Gazvoda provided misleading information to the VA when seeking disability benefits. Even if true, Defendants have not shown how these representations are relevant to the accommodation process.

regulations is a prerequisite for good faith engagement in the accommodation process. Gazvoda particularly emphasizes that "Ms. Davila testified that she does not know what the standard for granting an accommodation is." Pl. Mot. Summ. J. at 19–20. But Mr. Martinez, not Ms. Davila, was the ultimate decision maker on Gazvoda's accommodation request. Even if Ms. Davila was not knowledgeable about the accommodation process, the fact that she was not the ultimate decision maker means Defendants could engage in the process with good faith regardless of Ms. Davila's level of knowledge.

Next, Gazvoda argues that Defendants failed to engage in the process in good faith because they did not provide alternative locations where Gazvoda's request could be accommodated. However, "the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010). Thus, this argument falls short of demonstrating bad faith on Defendants' part.

Finally, Gazvoda points to "the evasive approach to discovery engaged in by the Government in this case." Pl. Mot. Summ. J. at 21–22. Regardless of whether that is true, any misconduct during discovery has no bearing on whether Defendants engaged in the accommodation process in good faith prior to the initiation of the suit. Although neither Plaintiff nor Defendants have modeled exemplary behavior during the accommodation request process, their obstreperous interactions fall short of constituting bad faith conduct.

In short, a myriad of factual issues remain unresolved. Given the equivocal medical evidence and the outstanding questions regarding Gazvoda's physical capabilities, summary judgment cannot be granted for either party at this time. Accordingly, the cross motions for summary judgment will be denied.

# IV.

The final matter is Gazvoda's motion for sanctions, ECF No. 58, arising out of Defendant's motion for a protective order, ECF No. 52. In Defendants' motion for a protective order, they sought an order precluding the depositions of Drs. Haskin, Swabish, Barger, and Lemmen. Defendants' rationale for seeking the motion was that the doctor's written opinions had already been provided to the parties and that "the only relevant information is contained in the documents submitted to CBP." *Id.* at 5. Defendants argued that the depositions would produce only duplicative or inadmissible evidence and thus the costs of preparing for and attending the depositions would outweigh any potential benefit. The Court denied Defendants' motion for a protective order. Jan 17, 2017, Op. & Order, ECF No. 57. The Court reasoned that, at the discovery stage, relevance was construed broadly. Defendants' arguments were unavailing because they confused the question of "whether evidence will be sufficient for Gazvoda to prevail on the merits with the question of whether the evidence is relevant." *Id.* at 13. However, the Court did acknowledge that "Defendants might ultimately prevail on their argument that their denial of the accommodation was reasonable based on the information known to them at the time." *Id.* at 10.

Now, Gazvoda argues that the motion for a protective order was filed for an improper purpose and that sanctions should be levied against Defendants. Federal Rules of Civil Procedure 26 and 37 allow for parties forced to defend against unjustified discovery motions to recover attorney fees. Federal Rule of Civil Procedure 26(g)(1)(B) requires parties to sign discovery motions to certify that the motion is "not interposed for any improper purpose" and is "neither unreasonable nor unduly burdensome." Pursuant to Rule 26(g)(2), the violating party may be forced to pay attorney fees if they file a motion that "violates this rule without substantial

justification." Rule 37(a)(5) deals with motions for a protective order. Under Rule 37(a)(5)(B), if a motion to compel or motion for a protective order is denied, the Court must order the movant to pay the attorney fees incurred in defending against the motion, unless "the motion was substantially justified or other circumstances make an award of expenses unjust."

Gazvoda first argues that sanctions should be imposed because the Government ultimately appeared at the deposition by phone. According to Gazvoda, if appearing by phone was always an option, then the motion was unnecessary. But that is not necessarily true. Defendants sought the protective order because they believed that the deposition would not produce relevant, admissible information. They further sought the protective order because of the time required to prepare for and conduct the deposition, not just the time required to travel to the deposition location. Those concerns are legitimate, even though the Court concluded that the burdens of the discovery were outweighed by the potential benefit.

Second, Gazvoda argues that the Defendants' motion was not supported by the law. As explained above, Defendants asserted that the dispositive question in the case was whether Gazvoda had adequately supported his request for an accommodation with medical documentation. Defendants argued that, if denial of the accommodation was reasonable based on the information then known to Defendants, Gazvoda could not prevail. Defendants properly identified a legal barrier that Gazvoda would be required to surmount, and Defendants could have conceivably prevailed on that argument at summary judgment.[21] But the Court reasoned that "testimony about Gazvoda's medical condition now and at the time of the accommodation request is relevant to other elements of Gazvoda's claim, even if it is irrelevant to the question of whether the documentation submitted to Defendants was sufficient to require an

---

[21] As explained above, Gazvoda has identified sufficient facts in the record to avoid summary judgment based on that issue.

accommodation." Jan. 17, 2017, Op. & Order at 11. The law, as applied to the case before the Court, did not justify a protective order or, ultimately, summary judgment for Defendants. But Defendants' argument was not patently unreasonable. *See Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) ("'[T]he mere fact that an action is without merit does not amount to bad faith.'") (quoting *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 753 (6th Cir. 2010)). As such, Gazvoda's motion for sanctions will be denied.

## V.

Accordingly, it is **ORDERED** that Plaintiff Gazvoda's motion for summary judgment, ECF No. 63, is **DENIED.**

It is further **ORDERED** that Defendants' motion for summary judgment, ECF No. 64, is **DENIED.**

It is further **ORDERED** that Plaintiff Gazvoda's motion for sanctions, ECF No. 58, is **DENIED.**


Dated: June 16, 2017                                  s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 16, 2017.

                              s/Kelly Winslow
                              KELLY WINSLOW, Case Manager