UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY A. GAZVODA,

                Plaintiff,                    Case No. 15-cv-14099

v.                                      Honorable Thomas L. Ludington

SECRETARY OF HOMELAND SECURITY, and
COMMISSIONER OF UNITED STATES
CUSTOMS AND BORDER PROTECTION,

                Defendants.

_____/

**ORDER DENYING DEFENDANTS' MOTION IN LIMINE TO PRECLUDE EVIDENCE
OF FRONT PAY,  GRANTING MOTION IN LIMINE TO PRECLUDE PLAINTIFF
FROM CALLING AGENCY COUNSEL, GRANTING IN PART DEFENDANTS'
MOTION TO LIMIT TESTIMONY OF TREATING PROFESSIONALS, DENYING
PLAINTIFF'S MOTION FOR SANCTIONS, AND OVERRULING PLAINTIFF'S
OBJECTIONS TO THE MAGISTRATE JUDGE'S DECISION ON PLAINTIFF'S
MOTION TO COMPEL**

Plaintiff Anthony Gazvoda filed a complaint against Defendants the Secretary of

Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP") on November 21,

2015. ECF No. 1. In the complaint, Gazvoda alleges that the Defendants wrongfully denied his

request for a reasonable accommodation. Gazvoda is a veteran who has been diagnosed with Post-

Traumatic Stress Disorder ("PTSD") and who requested reassignment from his post as a border

patrol agent in Laredo, Texas, to Sault Ste. Marie, Michigan. On April 3, 2017, the parties filed

cross motions for summary judgment. The Court denied the cross motions on June 16, 2017. ECF

No. 73. In July 2017, the Court docketed a stipulated proposed order which reset deadlines for

expert disclosures and reopened expert discovery. ECF No. 77. In September 2017, the final

pretrial conference was reset for February 13, 2018, and the bench trial was reset for February 27, 2018. ECF No. 79.

In late November and early December 2017, the Government filed four pretrial motions raising evidentiary issues in anticipation of the bench trial. ECF Nos. 91, 95, 96, 97. Gazvoda also appealed a magistrate judge decision regarding a previously filed motion to compel. ECF No. 104. On January 16, 2018, Gazvoda filed a motion for sanctions against the Government arguing that it has advanced baseless arguments in one of its motions in limine. In light of the contentious and ongoing motion practice, the bench trial was adjourned to April 10, 2018. ECF No. 113. The pending motions and appeals are now ripe.

## I.

In the June 16, 2017, opinion and order, the Court summarized the facts—disputed and undisputed—at length. ECF No. 73. That summary will be adopted as if restated in full. To the extent certain facts become relevant to the pending motions or the parties disagree regarding whether certain factual issues exist, those disputes will be considered below.

## II.

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). "'Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of material fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir.1990)). Motions in limine in civil cases serve a "more limited [] purpose" compared to motions in limine in criminal cases. *Id.*

"In a civil action [and unlike in criminal cases], the question [of] whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment." *United States v. Bailey*, 444 U.S. 394, 413 n.9 (1980).

> In other words, a mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion. Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment.

*Louzon*, 718 F.3d at 561.

Accordingly, litigants may not raise non-evidentiary matters in limine—like a challenge to the sufficiency of evidence for a certain defense—in a civil case. *Id.* at 562 (collecting cases). *See also Bell v. Prefix, Inc.*, No. 05-74311, 2009 WL 3614353, at *1 (E.D. Mich. Nov. 2, 2009) ("'Normally, motions *in limine* are not proper procedural devices for the wholesale disposition of theories or defenses.'") (quoting *SPX Corp. v. Bartec USA, LLC*, No. 06–14888, 2008 WL 3850770, at *3 (E.D.Mich. Aug.12, 2008)).

Motions in limine may properly be used to "eliminate[e] evidence that is clearly inadmissible for *any* purpose." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). In other words, the "court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Id.* "A ruling on a motion in limine is no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). For that reason, a court may amend its ruling during the course of trial. *Luce*, 469 U.S. at 41–42.

In fact, "'[c]ourts are generally reluctant to grant broad exclusions of evidence in limine because a court is almost always better situated during the actual trial to assess the value and utility of evidence.'" *Ohio Willow Wood Co. v. Alps S., LLC*, No. 2:04-CV-1223, 2014 WL 3734342, at

*2 (S.D. Ohio July 29, 2014) (quoting *Weimer v. Honda of Am. Mfg., Inc.*, No. 2:06–cv–844, 2008 WL 4332525, at *1 (S.D.Ohio Sept.17, 2008)). *See also Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) ("Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise."). The presumption against broadly excluding entire categories of evidence in advance of trial is "particularly strong in a bench trial." *Bank One, N.A. v. Echo Acceptance Corp.*, No. 04-CV-318, 2008 WL 1766891, at *1 (S.D. Ohio Apr. 11, 2008). "Without the fear that prejudicial or improper evidence will taint the jury, courts are even more inclined to take a wait-and-see approach." *Id.*

### III.

Defendants have raised a number of pretrial evidentiary objections. In the first, Defendants seek to prevent Gazvoda from introducing evidence supporting a claim for front pay. In the second and third, Defendants seek to limit or exclude the testimony of certain witnesses. Defendants have also filed objections to certain of Gazvoda's pretrial disclosures. For the following reasons, Defendants' motion to preclude front pay evidence will be denied, the motion exclude the testimony of agency counsel will be granted, the motion to limit expert witness testimony will be granted in part, and the objections to pretrial disclosures will be overruled.

### A.

### 1.

When "an employee is improperly discharged," reinstatement "'is the presumptively favored equitable remedy.'" *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 537 (6th Cir. 2011) (quoting *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir.1993)). But reinstatement is not appropriate in all cases, including "where the plaintiff has found other work, where

reinstatement would require displacement of a non-culpable employee, or where hostility would result." *Roush*, 10 F.3d at 398. Accordingly, plaintiffs may seek an award of front pay, but "the initial 'determination of the propriety of an award of front pay is a matter for the court.'" *Arban v. W. Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003) (quoting *Roush*, 10 F.3d at 398).

"The decision to award front pay damages is 'governed by the sound discretion of the trial court.'" *Wilson v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 83 F.3d 747, 756 (6th Cir. 1996) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984)). For that reason, "[n]o per se rule governs the appropriateness of front pay damages in a particular case." *Id.* The ultimate question "is whether front pay damages are needed in a particular case to make the plaintiff whole." *Id.* at 757.

> Several factors must be considered when determining the propriety of an award of front pay, including "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards."

*Arban*, 345 F.3d at 406 (quoting *Roush*, 10 F.3d at 399).

**2.**

Defendants argue, first, that "[b]ecause Plaintiff was a BPA for less than a year, has a demonstrated ability to earn a comparable salary, is currently working, and is early in his work expectancy, front pay is not appropriate as a matter of law." Mot. Preclude Front Pay at 8, ECF No. 95. Second, Defendants argue that "[e]ven if Plaintiff could establish an entitlement to front pay at trial, Plaintiff does not have sufficient evidence to support an award." *Id.*

Defendants are essentially arguing that Gazvoda has identified insufficient evidence to justify an award of front pay. Defendants' requested remedy for that failure is to preclude Gazvoda from submitting *any* evidence supporting its claim of front pay. In other words, Defendants are

seeking exactly what the Sixth Circuit forbade in *Louzon*: the exclusion of an entire category of evidence based on the argument that the Plaintiff will produce insufficient evidence to support the theory. 718 F.3d at 561. Defendants' sufficiency of the evidence argument simply cannot be raised in a motion in limine.

The legal standards articulated above make clear that the propriety of a front pay award is fact-dependent. There is no per se rule governing whether to award front pay, and thus a variety of factors must be considered. *Wilson*, 83 F.3d at 756. In their motion in limine, Defendants argue consideration of those factors counsel against an award of front pay. But that argument goes to the merits of the inquiry. It is not an evidentiary issue regarding the admissibility of the underlying evidence. Defendants' argument thus begs the question: whether Gazvoda should be prevented from presenting evidence supporting a front pay claim because Gazvoda will produce insufficient evidence to prevail on that claim.

A review of Defendants' factual arguments simply underscores this conclusion. Defendants argue, first, that a front pay award is inappropriate because Gazvoda has found other full-time employment. That may be true, but the ultimate question is whether front pay is necessary to make Gazvoda whole. *Wilson*, 83 F.3d at 757. The fact that Gazvoda has found other employment is relevant to that question, but does not operate as an automatic prohibition on front pay. Defendants also argue that "[t]he length of Plaintiff's remaining work expectancy . . . makes an award of front pay damages inappropriate." Mot. Preclude Front Pay at 7. A plaintiff's work and life expectancy is undoubtedly relevant to the determination of whether front pay is appropriate, but other factors must also be considered. *Arban*, 345 F.3d at 406. Defendants have not demonstrated that evidence of front pay is inadmissible for any purpose. To the contrary,

Defendants' arguments can only be resolved through an adjudication on the merits of the front pay claim. The motion in limine to preclude evidence of front pay will be denied.

Having said that, the briefing on this motion in limine does serve to frame the relevant issues. Defendants' argument that Gazvoda is not entitled to front pay is compelling. In the motion in limine, Defendants provide a summary of Gazvoda's post-CBP employment. Mot. Preclude Front Pay at 5. That summary reveals that Gazvoda has worked for a number of employers since leaving CBP and has received wages roughly commensurate with his compensation at CBP. In response, Gazvoda contends that these positions were temporary and "did not provide nearly the same opportunities for upward mobility." Def. Resp. Mot. Preclude Front Pay at 7–8. That may be true, but Gazvoda should be prepared to explain why those facts matter. Gazvoda's ability to move between jobs quickly suggests that temporary employment has not harmed his compensation. To the extent Gazvoda contends that he has a right to compensation for lost opportunities at advancement, he should be prepared to support that assertion.

The parties also dispute what Gazvoda's salary with CBP was during the relevant time period. The Government contends that Gazvoda is a GL-9, Step 1, which corresponds to a yearly salary of $49,029. Gazvoda contends that he achieved the level of GL-11 in 2013 and GL-12 in 2014. Gazvoda has provided pay stubs which corroborate that assertion and reflect an increase in pay. *See* Pay Stubs, ECF No. 100, Ex. B. Because Gazvoda was on leave without pay during this time period, he did not actually receive the pay increase. But the pay stubs at least suggest that, had he been transferred, he would have received the increase in pay level. The parties should be prepared to resolve these factual issues at trial.

**B.**

Defendants' second motion is limine requests that the Court preclude Gazvoda from calling Ryan Thornton, an attorney working for Defendants, as a witness. Mot. Precl. Pl. Agency Counsel, ECF No. 96. Mr. Thornton is agency counsel for Customs and Border Patrol. On December 30, 2016, Defendants responded to Plaintiff's first set of interrogatories. On March 30, 2017, two individuals verified that the interrogatory answers were accurate: Mr. Thornton and Cindy Hornbaker, a supervisory mission support specialist with CBP. Interr. Ans. at 18–19, ECF No. 96, Ex. 1. Gazvoda has disclosed Mr. Thornton as a potential fact witness. Pl. Supp. Discl. at 2, ECF No. 96, Ex. 2; Pretrial Discl. at 2, ECF No. 82. Gazvoda suggests that Mr. Thornton possesses "[k]nowledge of Defendant CBP's policies and procedure regarding requests for reasonable accommodation . . . [and] knowledge of Defendant CBP's hiring procedures, pay grades, and promotion opportunities. Mr. Thornton is also familiar with this litigation." Pl. Supp. Discl. at 2.

Defendants argue that Gazvoda should be prevented from calling Mr. Thornton as a witness because he is agency counsel for CBP. Gazvoda argues that Mr. Thornton has rendered himself a fact witness by verifying that CBP's interrogatory answers were true to the best of his knowledge.

Pursuant to Federal Rule of Civil Procedure 33(b)(1)(B), interrogatories directed towards a "governmental agency" must be answered "by any officer or agent, who must furnish the information available to the party." Pursuant to Rule 33(b)(5), "[t]he person who makes the answers must sign them, and the attorney who objects must sign any objections." Defendants' counsel, Jennifer Newby, signed the answers, while Mr. Thornton (agency counsel) and Ms. Hornbaker, verified that the responses were true and correct based upon their personal knowledge and review of available information. Interr. Ans. at 18–19.

If an organization uses an officer or agent to answer interrogatories, "[t]he person is not required to have personal knowledge of any or all of the information sought, and indeed cannot limit his answers to matters within his personal knowledge. Rather, the person must reasonably ensure that the answers provided accurately furnish the information available to the organization." Rule 33 Commentary at Footnotes 83–86.[1]

Contrary to Gazvoda's assertion, then, the fact that Mr. Thornton verified the answers does not necessarily prove that he has personal knowledge of the underlying information provided in the answers. To the contrary, Mr. Thornton's assertion that the answers are true based on his "personal knowledge" and review of available information suggests simply that he has made the required investigation into the agency's knowledge and information.[2] *See Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1482 (D.C. Cir. 1995) (confirming that an agency representative need not have personal knowledge for every answer).[3] And, in fact, Defendants contend that Mr. Thornton *does not* possess personal knowledge of the underlying facts. *See* Mot. Precl. Pl. Agency Counsel 4–5 ("Thornton is agency counsel for CBP and does not have first-hand knowledge of the facts germane to this case. Rather, in his role as counsel, he gathered information for discovery

---

[1] It is permissible for an attorney to verify interrogatory answers as an agent, but in doing so the attorney is acting in his or her capacity as an agent. *Id.* at Footnotes 91–93.

[2] Gazvoda repeatedly argues that this language necessarily means that Mr. Thornton was admitting to having personal knowledge of the answers and was not simply verifying their veracity on behalf of the agency. But it is more plausible that the language simply meant that Mr. Thornton, in due diligence, had personally ensured that "the answers provided accurately furnish[ed] the information available to the organization." Rule 33 Commentary at Footnotes 83–86.

[3] Gazvoda cites to a variety of cases which hold that, if responses are signed only by an attorney and not by the client, "the attorney has effectively been made a witness." *Saria v. Massachusetts Mut. Life Ins. Co.*, 228 F.R.D. 536, 539 (S.D.W. Va. 2005). *See also United States v. Quebe*, 321 F.R.D. 303, 310 (S.D. Ohio 2017). These cases deal with scenarios where no representative of the Defendant verified the accuracy of the answers. That is not the case here. Two CBP representatives—Mr. Thornton and Ms. Hornbaker—verified the answers. If those representatives had not verified the answers, then this line of cases would become relevant and the Court would have assumed that Ms. Newby was herself verifying the accuracy of the answers. Accordingly, these cases provide limited assistance.

responses and verified on behalf of CBP that the responses were accurate to the best of his knowledge"). Gazvoda has provided no reason to disbelieve this representation.

Some courts have refused to permit depositions of corporate representatives who verified responses if the representatives lack personal knowledge of the particular facts of the case. *See Jiminez-Carillo v. Autopart Int'l, Inc.*, 285 F.R.D. 668, 670 (S.D. Fla. 2012) (collecting cases). Gazvoda's contention that Mr. Thornton *must* possess personal knowledge is premised, as explained above, on a misapprehension regarding what verification by a representative of a government agency means.

Gazvoda asserts that he must call Mr. Thornton at trial to "confirm the accuracy of the Government's interrogatory response, clarify CBP policies that Mr. Thornton has personal knowledge of, and elicit any information he may have in regards to the case." Pl. Resp. Mot. Precl. Pl. Agency Counsel at 15, ECF No. 102. More specifically, Gazvoda accuses the Government of "selective amnesia" because both Alicia Davila and Mario Martinez, fact witnesses who work in the Government's Office of Diversity and Civil Rights, testified that they lacked knowledge of the Government's "specific procedures in regards to reviewing requests for reasonable accommodation." *Id.* at 14. Gazvoda believes that questioning of Mr. Thornton is necessary to uncover the source of Mr. Thornton's answers regarding those procedures. Gazvoda has not specifically identified a contradiction between Alicia Davila and Mario Martinez's testimony and specific answers made by Mr. Thornton and Ms. Hornbaker.

The only contradiction between Defendants' answers and later discovery which Gazvoda's identifies involves whether transfers to the northern border are subject to seniority requirements. In Defendants' answers, they explained that Gazvoda was "not eligible to be reassigned to [the northern border] based on his seniority." Interr. Ans. at 3, 5–7. In the August 1, 2016, opinion and

order, the Court found that the collective bargaining agreement between the CBP and the border patrol agents "allows CBP to reassign personnel for reasons not governed by seniority." August 1, 2016, Op. & Order at 38. Having prevailed in proving that seniority was not a bar to Gazvoda's reassignment, it is unclear why Mr. Thornton need be questioned on this issue. The Court's prior conclusion was based on an interpretation of the language of the CBA, and at the bench trial the Court will be fully capable of examining that source document again.

Thus, Gazvoda's need to question Mr. Thornton is not well supported. Gazvoda's briefing simply relies upon broad generalities. To the extent the testimony of other fact witnesses contradicts answers Defendants have previously given, Gazvoda may use that inconsistency to impeach. The only conceivable reason to question Mr. Thornton would be to ask him to identify the documents and individuals he relied upon in drafting the answers.

But that information could also be obtained by questioning Ms. Hornbaker. Gazvoda's briefing ignores the fact that both Mr. Thornton *and* Ms. Hornbaker verified the answers as true.[4] *See* Interr. Ans. at 18–19. Gazvoda has noticed both Mr. Thornton and Ms. Hornbaker as witnesses. Pretrial Discl. at 2. Defendants do not challenge Gazvoda's right to call Ms. Hornbaker as a witness.

---

[4] In his motion for sanctions (considered below), Gazvoda argues that Ms. Hornbaker verified only Defendants' response to one question (the first). The verification provided by Ms. Hornbaker is ambiguous. It states that "the response to Plaintiff's Interrogatory 1 served with Plaintiff's First Requests for Admissions, Interrogatories, and Requests for Production of Documents is True and Correct." Interr. Ans. at 19. Defendants now represent that CBP provided "two verifications for its interrogatory responses" which were "signed by Cindy Hornbaker . . . and CBP agency counsel Ryan Thornton." Def. Resp. Mot. Sanctions are 3, ECF No. 112. Defendants also reference a prior affidavit provided by Ms. Hornbaker, ECF No. 36, Ex. 1, which contains information which appears to support Defendants responses to all (or most) of the interrogatories.

Defendants thus represent (and there is reason to believe) that Ms. Hornbaker verified all the interrogatory answers, notwithstanding the ambiguous language in the verification itself. Defendants should be prepared to clarify whether that is true at the final pretrial conference. If not, the request for exclusion may be reconsidered.

The only apparent difference between Mr. Thornton and Ms. Hornbaker is that Mr. Thornton is in-house counsel for CBP. As Defendants argue, a "heightened standard" applies when a party seeks discovery from an opposing counsel. *Spine Sols., Inc. v. Medtronic Sofamor Danek, Inc.*, No. 07-2175 JPM-DKV, 2008 WL 199709, at *3 (W.D. Tenn. Jan. 23, 2008). Specifically, that discovery could be permitted only if Gazvoda can show that "(1) no other means exist to obtain the information . . . ; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir.1986)).

Gazvoda argues that the *Shelton* standard is "limited to those instances where the attorney to be deposed is either trial/litigation counsel or the subject matter of the deposition may elicit litigation strategy." *Ellipsis, Inc. v. Color Works, Inc.*, 227 F.R.D. 496, 497 (W.D. Tenn. 2005). He contends that Mr. Thornton is in-house counsel but not litigation counsel, and thus no showing of need is required. But the Sixth Circuit has held that the *Shelton* standard applies to in-house counsel who "obtained documents in relation to potential litigation" even if the counsel "did not develop litigation strategy." *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 573–74 (6th Cir. 2015).[5]

Mr. Thornton has submitted a sworn affidavit wherein he affirms that he "was assigned as agency counsel on behalf of U.S. Customs and Border Protection in the above captioned matter from its inception and continue to serve in that capacity." Thornton Aff. at 1, ECF No. 108, Ex. 1. There is no reason to believe that Mr. Thornton has any personal knowledge of facts relevant to

---

[5] Gazvoda also argues that Thornton cannot be both an agency representative who verifies interrogatories and also litigation counsel. But *Allomari* clarifies that the *Shelton* protections apply to in-house counsel even if they are not actively litigating the case before the trial court.

this litigation which was *not* acquired by obtaining and reviewing documents in relation to potential or ongoing litigation. Indeed, the fact that Mr. Thornton verified the interrogatory answers simply suggests that his knowledge of the case was obtained after litigation began and during his collection of records and interviews with individuals. In other words, to the extent Gazvoda seeks to question Mr. Thornton regarding "the Government's policies and procedures . . . and elicit any information he may have in regards to the case," Gazvoda is seeking information "integrally tied to the litigation process" *Alomari*, 626 Fed. App'x at 574.

Indeed, the same information can be obtained from Ms. Hornbaker without fear of violating a privilege (or at least, no explanation has been provided for why questioning of Ms. Hornbaker would be insufficient). The implication is that Gazvoda wishes to question Mr. Thornton, rather than Ms. Hornbaker, *because* Mr. Thornton is in-house counsel for CBP and thus privy to litigation strategy.

At this stage, Gazvoda has not satisfied any of the *Shelton* factors. The information sought appears to be available from Ms. Hornbaker (if not from other fact witnesses). To the extent Mr. Thornton possesses information which Ms. Hornbaker does not, that information is likely to be privileged. *See Gruenbaum v. Werner Enterprises, Inc.*, 270 F.R.D. 298, 309–10 (S.D. Ohio 2010); *Massillon Mgmt., LLC v. Americold Realty Tr.*, No. 5:08CV0799, 2009 WL 614831, at *4 (N.D. Ohio Jan. 21, 2009). And, finally, the Court is unpersuaded that questioning of Mr. Thornton is crucial to his case. As mentioned above, to the extent there are contradictions between Defendants' interrogatories answers and testimony of fact witnesses, Gazvoda may use that contradiction to impeach the witnesses.

If at trial, Gazvoda can more specifically identify what information he believes Mr. Thornton has personal knowledge of (and not knowledge developed merely in preparing to answer

the interrogatories), this ruling may be revisited. In particular, Gazvoda would be required to explain what information Mr. Thornton has that Ms. Hornbaker does not. Until and unless such a showing is made, however, Gazvoda will not be permitted to call Mr. Thornton as a witness.

## C.

Defendants have also filed a motion seeking to limit the testimony of Gazvoda's treating medical professionals. In Gazvoda's expert witness disclosures, he named five medical professionals who have treated or examined Gazvoda. Pl. Exp. Discl., ECF No. 97, Ex. 1. Specifically, Gazvoda identified (and provided brief testimony summaries for) Dr. Robert Barger, Dr. Kirk Swabash, Dr. John Haskin, Dr. Martin Vandenakker, and Dr. Robert Newhouse. *Id.* Gazvoda's pretrial witness list, ECF No. 82, lists Dr. James Byatt, Dr. Anthony Mills, and Social Worker Thomas J. Kirk as potential witnesses. In their motion in limine, Defendants argue that the testimony of Dr. Byatt, Social Worker Thomas Kirk, and Dr. Mills should be limited to lay witness testimony. Defendants further argue that the testimony of the disclosed medical professionals should be limited to the opinions "that were disclosed in Plaintiff's Rule 26(a)(2)(C) disclosure and formed in the course of their diagnosis and treatment of Plaintiff." Mot. Excl. Treat. Pro. at 2, ECF No. 97.

## 1.

Federal Rule of Civil Procedure 26(a)(2)(A) require a party to "disclose to the other parties the identity of any witness it may use at trial to present" expert testimony. If the expert witness "is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," then the disclosure must involve a written report. *Id.* at Rule 26(a)(2)(B). If a written report is not required, then the expert witness disclosure must state "the subject matter on which the witness is expected to present evidence"

and "a summary of the facts and opinions to which the witness is expected to testify." *Id.* at Rule 26(a)(2)(C)(i)–(ii).

The Commentary to the Federal Rules of Procedure discusses, at length, the disclosure requirements when treating physicians are anticipated as witnesses. The Commentary explains that "courts consistently hold that treating physicians ordinarily must be disclosed as expert witnesses (or have their testimony limited to lay fact observations)." Commentary to Rule 26, Footnotes 87–88. A related issue is "what additional information must be supplied for treating physicians." *Id.* at Footnotes 88–89. Generally, "treating physicians . . . do not have to file formal expert reports" because "treating physicians that limit their opinions to those developed during diagnosis and treatment are not considered to be 'retained or specially employed' as experts." *Id.* at Footnotes 91–93. However, treating physicians may not "give expert opinions that go beyond the scope of treatment and diagnosis without having to prepare a report with respect to those further opinions." *Id.* at Footnote 92. To summarize: "Treating physicians disclosed only as lay witnesses may testify only to lay facts. Treating physicians for whom summary disclosures are provided may opine on matters relating to treatment and diagnosis. If the treating physician files an expert report, then the treating physician may testify as a retained expert to matters that go beyond treatment and diagnosis." *Id.*

The summary of the law, as articulated in the Commentary, is consistent with how Rule 26(a)(2) is applied in the Sixth Circuit. *See Avendt v. Covidien Inc.*, 314 F.R.D. 547, 556 (E.D. Mich. 2016) (collecting sources); *Kassim v. United Airlines, Inc.*, 320 F.R.D. 451, 455 (E.D. Mich. 2017) (citing *Avendt*). The Sixth Circuit has explained that treating physicians may "testify without Rule 26(a)(2)(B) expert report disclosures so long as they do not purport to testify beyond the scope of their own diagnosis and treatment." *Ridder v. City of Springfield*, 108 F.3d 1377 (6th Cir.

1997) (internal citations omitted). In other words, if the treating physician's opinions were "formulated during the examination and care of [the patient]," no expert report is necessary. *Martin v. CSX Transp., Inc.*, 215 F.R.D. 554, 557 (S.D. Ind. 2003). If the opinions were formulated "in anticipation of litigation," then an expert report is required. *Id. See also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) ("[A] report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment."); *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 811 (6th Cir. 2005) (citing *Martin* and drawing a distinction between opinions formed during diagnosis and treatment and opinions formed in anticipation of litigation).

In *Fielden*, the Sixth Circuit identified additional relevant factors. First, Rule 26(a) is meant to allow both sides to adequately prepare their case and to avoid surprise at trial. 482 F.3d at 871. If the nature of the treating physician's testimony has been disclosed and the trial testimony does "not stray from the notice . . . provided," then an expert report may be unnecessary. *Id.* "When a physician testifies to issues beyond those covered in ordinary medical training, the physician is behaving in a manner more similar to a retained expert." *Id.* at 872. Likewise, if a treating physician "relies on tests, documents, books, videos, or other sources that the physician did not rely upon during his or her treatment of the patient," an expert report is required. But when the treating physician bases his or her opinion "as to the cause of . . . injury" only on the physician's observation and treatment of the patient, no expert report is required.

**2.**

**i.**

Defendants are challenging Gazvoda's ability to call two categories of witnesses. First, Defendants explain that Gazvoda has identified several medical professionals as potential witnesses, but has not made expert disclosures (summary or otherwise) for those witnesses. For that reasons, Defendants argue that Dr. Byatt, Dr. Mills, and Mr. Kirk (a social worker) should be limited to testifying as lay witnesses.

In response, Gazvoda indicates that Plaintiff only plans to call Dr. Byatt at trial (though Dr. Mills and Mr. Kirk may testify for impeachment or rebuttal purposes). Gazvoda further argues that Dr. Byatt's testimony should not be limited to lay testimony because the failure to provide a summary was both substantially justified and harmless. "The remedy for the failure to file the required expert report is exclusion of the opinion testimony, unless the Plaintiffs can establish that the insufficiency in their disclosures was either substantially justified or harmless." *Avendt*, 314 F.R.D. at 559 (citing Fed. R. Civ. P. 37(c)(1)).

According to Gazvoda, the failure to disclose Dr. Byatt's testimony was substantially justified because his opinion is relevant to an issue which Defendants did not raise until the settlement conference held on February 24, 2017, a week before discovery closed. At that conference, Defendants indicated that they had recently discovered treatment notes by Dr. Byatt which established that Gazvoda was not a qualified individual with a disability. The Court has already concluded that the untimely disclosure of Dr. Byatt's information was substantially justified because the issue to which his opinions are relevant arose very late in the litigation. June 16, 2017, Op. & Order at 19 n.12. The nondisclosure is likewise harmless. Defendants are on notice of Dr. Byatt's findings (in fact, Defendants were originally the ones to rely upon a form completed by Dr. Byatt in seeking dismissal). The parties have briefed the significance of Dr. Byatt's findings, and the Court has discussed their relevance. *Id.* at 19–20. Accordingly, Defendants' contention

that they have "no notice of what opinions Dr. Byatt . . . will provide at trial" is disingenuous. Mot. Excl. Treat. Pro. at 11.[6]

At this stage, of course, the scope of Dr. Byatt's trial testimony is undetermined. For that reason, a definitive conclusion regarding the permitted scope of his testimony is impossible. Dr. Byatt will be permitted to testify about what he observed during his treatment of Gazvoda. He may further testify regarding treatment and diagnosis to the extent that testimony is consistent with the statements he has already made. But Dr. Byatt will not be permitted testify beyond the scope of the records and letters he has previously provided, absent a showing of substantial justification and harmlessness by Gazvoda.

Gazvoda does not currently argue that the nondisclosure of Dr. Mills or Mr. Kirk as expert witnesses was substantially justified or harmless. He simply indicates that he does not currently anticipate calling them to testify. Absent a showing a substantial justification or harmlessness, Dr. Mills and Mr. Kirk will be limited to lay testimony. If Gazvoda argues at trial that substantial justifications exist or that nondisclosure was harmless, the issue will be revisited.

### ii.

Defendants further argue that Dr. Robert Barger, Dr. Kirk Swabash, Dr. John Haskin, Dr. Martin Vandenakker, and Dr. Robert Newhouse "should only be permitted to testify to opinions that were disclosed and that were formed during the course of their treatment and diagnosis of

---

[6] Defendants also argue that they have previously objected to Gazvoda's nondisclosures for expert witnesses. That argument is also misleading. Defendants cite to their December 14, 2016, motion for a protective order. ECF No. 52. In that motion, Defendants argued that the Court should preclude the depositions of certain physicians because "any new information elicited during the depositions that was not provided to Defendants while Plaintiff's request for accommodation was pending is *irrelevant*." Mot. Prot. Order at 1–2 (emphasis added). Defendants did not argue that the depositions should be precluded because the physicians had not been adequately disclosed as expert witnesses. The Court denied the motion for a protective order, noting that "testimony about Gazvoda's medical condition now and at the time of the accommodation request is relevant to other elements of Gazvoda's claim, even if it is irrelevant to the question of whether the documentation submitted to Defendants was sufficient to require an accommodation." January 17, 2017, Op. & Order at 11. Defendants' attempt to recharacterize past briefing is not well taken.

Plaintiff." Mot. Excl. Treat. Pro. at 12. These physicians were identified as expert witnesses and summaries of their testimony have been provided, but no expert reports have been disclosed.

Gazvoda agrees that the expert testimony of these witnesses "should be limited to their treating relationship with Plaintiff." Pl. Resp. Mot. Excl. Treat. Pro. at 11, ECF No. 101. The parties disagree regarding how to define the scope of the "treating relationship." Defendants contend that, at Dr. Haskin's deposition, Gazvoda elicited "new opinions . . . that were not disclosed or formed during his treatment." Mot. Excl. Treat. Pro. at 14. Rather than providing specific examples, they cite to the deposition transcript.

A review of the transcript reveals that the large majority of Dr. Haskin's testimony is directly related to his diagnosis and treatment of Gazvoda. For example, Dr. Haskin was asked whether he observed any racist tendencies or thoughts. Haskin Dep. at 49, ECF No. 97, Ex. 3. Significant portions of the deposition are focused on a discussion of Gazvoda's PTSD "triggers." Dr. Haskin was asked how much control Gazvoda had over his triggers and his response to them. *Id.* at 51. Dr. Haskin explained that, historically, PTSD has been misunderstood as being controllable. *Id.* at 52. Dr. Haskin also discussed why Gazvoda might be more comfortable in less populated areas, northern climates, and areas with fewer foreign speakers. *Id.* at 58–62. Dr. Haskin was asked whether denial of an accommodation affects a person's PTSD treatment. *Id.* at 69. He was also asked to review the efficacy of certain kinds of psychiatric testing another doctor conducted with Gazvoda. *Id.* at 91–93.

For the most part, this testimony appears to be part of a "permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden*, 482 F.3d at 871. The testimony regarding Gazvoda's triggers (and general information regarding characteristics of PTSD in

general) constitutes generalized medical information that Dr. Haskin would have inevitably relied upon in diagnosing and treating Gazvoda. The exception is Dr. Haskin's review of and critique of Dr. Lemmen's report. Haskin Dep. at 90–96. The opinions Dr. Haskin provides during that discussion pertain to a report which Dr. Haskin did not review during treatment of Gazvoda. Dr. Haskin's opinions regarding the persuasive value of Dr. Lemmen's report were thus formed "in anticipation of litigation." *Fielden*, 482 F.3d at 871.

Accordingly, Dr. Haskin will be prevented from rendering opinions on medical records or opinions which he did not review during his treatment of Gazvoda. Those opinions appear to constitute a small portion of his testimony. Rather, most of Dr. Haskin's testimony provides context or explanation for how he reached his conclusions regarding Gazvoda's diagnosis. No report is required for such testimony. If, at trial, Defendants specifically object to testimony outside the scope of Dr. Haskin's treatment relationship with Gazvoda, this issue will be revisited.

Defendants further argue that the testimony of Dr. Robert Barger, Dr. Kirk Swabash, Dr. Martin Vandenakker, and Dr. Robert Newhouse should likewise be dramatically limited. With respect to these doctors, Defendants provide even less specific objections. At best, Defendants argue that the doctors will "opine that placement in Michigan would be an appropriate accommodation" and seek to preclude that testimony. Defendants argue that these opinions should be precluded because "the physicians [with the exception of Dr. Swabash] treated Plaintiff well before, or well after, his accommodation request." Mot. Excl. Treat. Pro. at 18. This same argument was previously rejected by the Court. January 17, 2017, Op. & Order at 11 ("[T]estimony about Gazvoda's medical condition now and at the time of the accommodation request is relevant to other elements of Gazvoda's claim, even if it is irrelevant to the question of whether the documentation submitted to Defendants was sufficient to require an accommodation.").

Defendants have not attempted to rebut this conclusion. There is no reason to believe that Dr. Robert Barger, Dr. Kirk Swabash, Dr. Martin Vandenakker, and Dr. Robert Newhouse will provide testimony outside the scope of their treatment relationship with Gazvoda. To the extent that occurs at trial, the Court will entertain objections. The motion to limit the testimony of Gazvoda's treating physicians will be granted in part.

**D.**

Defendants have also filed "Objections to Plaintiff's Pre-Trial Disclosures." ECF No. 91. For the most part, these objections are best resolved at trial if and when they become relevant. Defendants argue that Gazvoda should be prevented from presenting certain witness testimony via deposition testimony because he had not met his burden under Federal Rule of Procedure 32. Gazvoda argues that the identified witnesses, except for Jeffrey Firestone, reside more than 100 miles from the Court, meaning their deposition testimony is admissible pursuant to Federal Rule of Civil Procedure 32(a)(4)(B). Defendants do not challenge that contention. Gazvoda further contends that he is simply reserving "the right to present [Mr. Firestone's] testimony via deposition transcript in the event he becomes unavailable at trial." Pl. Resp. Pretrial Objs. at 2, ECF No. 98. If that scenario comes to fruition, the admissibility of the deposition testimony will be addressed.

Defendants also object to the introduction of certain exhibits which Plaintiff may offer. Gazvoda asserts that some of the exhibits are publicly available documents prepared by and available to the Government. As to the other exhibits, Gazvoda explains that he does not intend to introduce any evidence which was not "disclosed to the Government or otherwise identified during

discovery." *Id.* at 3.[7] If these objections remain and become relevant during trial, they will be resolved then. In the meantime, Defendants' pretrial objections will be denied without prejudice.

## IV.

Gazovda has filed a motion for sanctions arguing that Defendants' motion to preclude Gazvoda from calling Ryan Thornton as a witness could only have been made in bad faith. ECF No. 111. Gazvoda accuses Defendants of acting in bad faith by refusing to properly verify its interrogatory answers. As the Court explained above in granting that motion in limine, the verifications in question complied with the Federal Rules. Specifically, it is permissible (even customary) for an attorney to verify interrogatory answers on behalf of a government agency. Rule 33 Commentary at Footnotes 91–93. In doing so, the attorney (acting as a representative or agent of the agency) "is not required to have personal knowledge of any or all of the information sought, and indeed cannot limit his answers to matters within his personal knowledge. Rather, the person must reasonably ensure that the answers provided accurately furnish the information available to the organization." *Id.* at Footnotes 83–86. *See also Longino v. City of Cincinna*, No. 1:12-CV-424, 2013 WL 831738, at *4–5 (S.D. Ohio Mar. 6, 2013) (explaining that "interrogatories to a governmental agency may be answered by an officer or agent of the agency" and refusing to permit deposition of the city attorney who answered the interrogatories because the *Shelton* factors had not been met).

Gazvoda cites to cases where no agent or representative verified responses, or where no substantive responses were made at all. *See, e.g., City of Colton v. Am. Promotional Events, Inc.*, No. CV 05-01479 JFW (EX), 2012 WL 13013379 (C.D. Cal. Mar. 22, 2012) (finding that the

---

[7] Defendants object to Gazvoda's use of unredacted transfer logs "because [the document] contains confidential information of non-parties." Def. Pretrial Objs. at 2. If an unredacted copy is proferred at trial, this objection will be resolved.

Defendants had engaged in extended and flagrant discovery misconduct, including using attorneys to verify interrogatory responses to avoid "providing substantive responses"). But that is not what happened here. Defendants provided substantive responses which were properly verified by two agency representatives (one of whom was in-house counsel). And, further, Defendants did not file the motion to preclude Gazvoda from calling Mr. Thornton as a witness in bad faith because the motion was meritorious. No sanctions are warranted here.

**V.**

Finally, Gazvoda has appealed from Magistrate Judge Patricia T. Morris's order granting his motion to compel Defendants to reimburse expert witnesses fees and costs. ECF No. 104. On November 9, 2017, Gazvoda filed a motion to compel payment of expert witness fees for the Government's deposition of Plaintiff's expert Dr. Michael Thomson. ECF No. 86. After the deposition in question, Dr. Thomson "sent the Government an invoice for his time spent in the deposition for 2 hours and 45 minutes at a rate of $750/hour." Mot. Compel at 2. The Government paid the invoice. Several weeks later, Dr. Thomson sent another two invoices. In his invoice to the Government, Dr. Thomson sought compensation for 1 hour and 15 minutes of preparation for the deposition, at the same hourly rate. In his deposition to Plaintiff, he sought compensation for 1 hour and 30 minutes of research before the deposition. *Id.* The Government refused to compensate Dr. Thomson for his preparation time.

The motion to compel was referred to Magistrate Judge Patricia T. Morris. ECF No. 89. Judge Morris held a hearing on December 4, 2017, and granted the motion in part. ECF No. 99. Specifically, Judge Morris directed Defendants to compensate Plaintiffs $472.50. *Id.* In so ordering, she concluded that Gazvoda should be reimbursed for 1.5 hours of deposition preparation time at an hourly rate of $315. Gazvoda has now appealed.

## A.

The decision and order of a non-dispositive motion by a magistrate judge will be upheld unless it is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *Massey v. City of Ferndale*, 7 F.3d 506, 509 (6th Cir. 1993). A district judge shall consider such objections and may modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a). "The 'clearly erroneous' standard applies only to the magistrate judge's factual findings; legal conclusions are reviewed under the plenary 'contrary to law' standard . . . . Therefore, [the reviewing court] must exercise independent judgment with respect to the magistrate judge's conclusions of law." *Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289, 291 (W.D. Mich. 1995) (citing *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992)). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Ford Motor Co. v. United States*, 2009 WL 2922875, at *1 (E.D. Mich. Sept. 9, 2009)).

Objections to a magistrate judge's non-dispositive order must be both timely and specific. *See Slater v. Potter*, 28 F. App'x 512, 512 (6th Cir. 2002). A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. *See VanDiver v. Martin*, 304 F.Supp.2d 934, 937 (E.D.Mich.2004). An "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Without specific objections, "[t]he functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrate's Act." *Id.*

**B.**

Gazvoda advances three objections. First, he argues that "the Magistrate Judge committed legal error by failing to consider the fact that the Government had already reimbursed Dr. Thomson at a rate of $750/hour for deposition attendance in determining the appropriate hourly rate for deposition preparation." Objs. at 4. Second, Gazvoda argues that Judge Morris committed legal error "by failing to consider the evidence in the record, including Dr. Thomson's CV, expert report, and invoices." *Id.* Third, Gazvoda argues that the Magistrate Judge committed legal error "by reducing Dr. Thomson's preparation time, where 2 hours and 45 minutes of preparation for an approximately 3 hour deposition was perfectly reasonable." *Id.*

Gazvoda does not challenge Judge Morris's legal findings. In fact, he concurs with her conclusion that the Government "is liable for Dr. Thomson's reasonable deposition preparation time." Thus, Gazvoda admits that he is objecting to Judge Morris's factual findings regarding the reasonable hourly rate and reasonable amount of preparation time. These factual findings will be overruled only if they are clearly erroneous. They are not. Rather, Gazvoda simply reasserts factual arguments already made before and rejected by Judge Morris.

**1.**

In his first objection, Gazvoda faults Judge Morris for rejecting his argument that the $715 hourly rate was unreasonable because the Government had already partially reimbursed Dr. Thomson at that rate. Gazovda contends that he was not arguing that the Government had *per se* waived any right to challenge the reasonableness of the rate. Rather, he believes that "there is no better evidence for the reasonableness of his rate than the Government's willingness to pay Dr. Thomson that rate." *Id.* at 5. Because, according to Gazvoda, Judge Morris only addressed the waiver issue and not the reasonableness issue, she committed error.

But that is inaccurate. Judge Morris considered Gazvoda's argument that the Government's willingness to pay Mr. Thomson's $750 hourly rate for the time spent at the deposition meant that the rate was reasonable. She first explained that "if the expert hourly rate on the bill, and time on the bill, was always considered reasonable, then, you know, the Court would have no role in this process." Dec. 4, 2017, Hearing Tr. at 38, ECF No. 103. Judge Morris then concluded that "the defendant thought that the bill was a single bill," meaning that the Government's willingness to pay the initial bill did not affirmatively foreclose a finding that the hourly rate was reasonable. Dec. 4, 2017, Hearing Tr. at 39. To the contrary, Judge Morris found that the Government's willingness to pay was suggestive of a belief that the roughly $2,000 the Government paid was "reasonable for the whole thing." *Id.*

Judge Morris clearly concluded that, notwithstanding the Government's prior payment, the hourly rate was unreasonable. *See id.* at 42–43. That was not clearly erroneous, especially because the only legal authority Gazvoda cites confirms that "even if [a rate paid by a party to an expert is presumptively reasonable], the Court is the ultimate arbiter of reasonableness." *Cohen v. Jaffe, Raitt, Heuer, & Weiss, P.C.*, 322 F.R.D. 298, 302 (E.D. Mich. 2017). Perhaps Judge Morris could have more expressly considered the Government's prior payment as a factor in determining the reasonable hourly rate, but Judge Morris did not ignore that fact. Judge Morris's determination that the Government's prior payment was premised on the idea that the request would fully compensate the expert was reasonable. Accordingly, her further conclusion that the Government's prior payment was not strongly probative evidence of reasonableness was also sensible.

**2.**

Second, Gazvoda argues that Judge Morris incorrectly concluded that Plaintiff had not submitted sufficient evidence to justify a finding that the $750 hourly rate was reasonable.

Specifically, he contends that "the Magistrate Judge committed legal error by failing to address evidence in the record, including Dr. Thomson's *curriculum vitae*, invoices directed to both parties, Dr. Thomson's extensive expert report prepared for this litigation, and the transcript of Dr. Thomson's deposition." Objs. at 7.

During the hearing, Judge Morris asked if Gazvoda's counsel could identify any cases where an hourly rate of approximately $700 was found reasonable. Dec. 4, 2017, Hearing Tr. at 22. Plaintiff's counsel admitted that he had not briefed that issue and could not immediately identify an instance. *Id.* Later in the hearing, Plaintiff's counsel argued that the hourly rate was reasonable because Dr. Thomson "is an economics professor. He is a labor economist. He . . . [has] academic credentials." *Id.* at 26. In response to Judge Morris's skepticism regarding Gazvoda's argument that the hourly rate was reasonable because the Government had already partially paid for the deposition at that rate, Gazvoda's counsel requested leave to file a supplemental brief "to support the reasonableness of Dr. Thomson's fees with the very type of evidence, including a declaration from Dr. Thomson and applying his CV to other cases where he has billed and received that rate." *Id.* at 29. Judge Morris declined to permit supplemental briefing, noting that the parties had submitted a joint statement of unresolved issues prior to the hearing which framed the issue of whether Dr. Thomson's hourly rate was reasonable. ECF No. 94. Judge Morris admonished Plaintiff's counsel for being unprepared to factually support the reasonableness of the hourly rate. Dec. 4, 2017, Hearing Tr. at 33. She suggested that Plaintiff's counsel assumed they would prevail on their argument that the Government's prior payment was sufficient proof of reasonableness, and so neglected to prepare alternative evidentiary support. *Id.*

Ultimately, Judge Morris concluded that "there isn't good support for the fee for the reasonableness of the fee at 750 an hour, other than just he's a good expert, and he's got a good

curriculum vitae, and he's very qualified and all of that." *Id.* at 42. And, earlier in the hearing, Judge Morris asked: "What's so complex about wages?" *Id.* at 7. After Plaintiff's counsel summarized Dr. Thomson's CV, she reasoned: "[D]oes it really matter whether someone has a bachelor's or a Ph.D. . . . That doesn't really add to the complexity of the issue. It may add to his CV, so your guy has a better CV than the defense, . . . but that doesn't necessarily add to the complexity of the work." *Id.* at 7–8. Based on this rationale, and with reference to the *Cohen* opinion, Judge Morris found that the "750 fee is very high, . . . and so I would say, as did Judge Patti [in *Cohen*], that the $315 an hour is a reasonable fee." *Id.* at 42 (citing *Cohen*, 322 F.R.D. 298 (noting that an hourly rate of $715 was "eye-popping")).

Gazvoda's current arguments do not identify an error in Judge Morris's reasoning. Even if an "expert's regular hourly rate for professional services" is the presumptively reasonable rate, she was permitted to examine other factors. *Bonar v. Romano*, No. 2:08-CV-560, 2010 WL 4280691, at *1 (S.D. Ohio Oct. 25, 2010). Judge Morris believed that Gazvoda had failed to identify sufficient evidence to justify the high hourly rate, and so reduced the rate to one commensurate with other recent decisions in this district. She considered Dr. Thomson's credentials and experience, but found them unpersuasive because the task for which he was retained was not overly complex. Because both Plaintiff's and Defendants' experts engaged in similar projects at similar levels of complexity, Judge Morris also did not err in considering the Defendants' expert's rate, despite the disparity in their credentials. The fact that a less credentialed expert ably handled the same calculations suggests that Dr. Thomson's illustrious credentials were unnecessary for the nature of the work. Gazvoda ignores that he bore the burden of proving the reasonableness of the requested rate. *Cohen*, 322 F.R.D. at 298.

Reasonable minds might disagree regarding the appropriate hourly rate for Dr. Thomson. But, at best, Gazvoda's arguments suggest that Judge Morris might also have reasonably concluded that the hourly rate of $750 was justified. Even if true, that argument falls far short of demonstrating the Judge Morris's factual findings were so unreasonable as to be clearly erroneous.

**3.**

Finally, Gazvoda argues that Judge Morris erred in reducing the compensable preparation time to one-half of the time Dr. Thomson spent being deposed. He contends that Judge Morris applied a *per se* rule that "deposition preparation time should be limited to one-half of the amount of time the witness spent being deposed." Objs. at 21. That argument is a mischaracterization of Judge Morris's holdings.

At the hearing, Judge Morris reasoned as follows:

> . . . the plaintiff's expert has indicated that he spent two-point -- two hours and 45 minutes, not the 2.45, right, on his deposition prep -- preparation time, and the deposition itself was three hours. Judge Patti used a figure which was half the time to prepare for the deposition compared to the deposition time, or the amount of time the deposition lasted, and that's why we had talked somewhat about, you know, what are the kinds of ratios that you could use.
>
> And as I indicated, there's, you know, three hours prep time to one deposition, one-to-one. There are cases that support one-to-one, that Packer (ph) case. El Camino said three hours prep to one hour deposition. The cases are all over the place. I think because of the plaintiff's description of his expert -- or I'm sorry -- yeah, plaintiff's description of his expert's time as including both of those that I think the -- Judge Patti's half time is probably a good indicator. So it was a three hour deposition, I am going to say, then, that the -- Dr. Thomson is entitled to one and a half hours deposition preparation time.

Dec. 4, 2017, Hearing Tr. at 41–42.

Thus, Judge Morris clearly recognized that there was no bright line rule for the ratio of reasonable preparation time. Gazvoda argues that "the amount of compensable deposition preparation time is determined on a case-by-case basis," and Judge Morris appears to have made that determination.

She concluded, relying on a recent case from this district, that a half-time ratio was reasonable. That finding was not clearly erroneous.

None of Gazvoda's objections identify a clear error in Judge Morris's decision, and so the objections to her order granting in part Plaintiff's motion to compel will be overruled.

## IV.

Accordingly, it is **ORDERED** that Defendants' motion in limine to preclude front pay evidence, ECF No. 95, is **DENIED.**

It is further **ORDERED** that Defendants' motion in limine to preclude agency counsel as witness, ECF No. 96, is **GRANTED.**

It is further **ORDERED** that Defendants' motion in limine to limit expert testimony, ECF No. 97, is **GRANTED in part.**

It is further **ORDERED** that Defendants' pretrial objections to Plaintiff's pretrial disclosures, ECF No. 91, are **DENIED without prejudice.**

It is further **ORDERED** that Plaintiff's motion for sanctions, ECF No. 111, is **DENIED.**

It is further **ORDERED** that Plaintiff's objections to the Magistrate Judge's order granting in part Plaintiff's motion to compel, ECF Nos. 86, 99, 104, are **OVERRULED.**


Dated: March 13, 2018                                    s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 13, 2018.

                              s/Kelly Winslow
                              KELLY WINSLOW, Case Manager